1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

DENNY TALADAY, et al.,

NO.  C14-1290-JPD

9

Plaintiffs,

10

v.

ORDER ON CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT
AND MOTION FOR JOINDER

11

METROPOLITAN GROUP PROPERTY
AND CASUALTY INSURANCE
COMPANY,

12

13

Defendant.

14

15

I.       INTRODUCTION AND SUMMARY CONCLUSION

16

This matter comes before the Court upon the parties' cross-motions for partial

17

summary judgment, Dkts. 79, 82, 85, and MetLife's motion for joinder of plaintiffs'

18

brother Bernard Taladay as a necessary party pursuant to Fed. R. Civ. P. 19, Dkt. 102.

19

The Court has considered the parties' written submissions, oral argument on the motions,

20

the governing law, and the balance of the record, and hereby DENIES plaintiffs' Motion

21

for Partial Summary Judgment Re: Insurance Fair Conduct Act, Bad Faith, and

22

Consumer Protection Act, Dkt. 79, as well as MetLife's motion for joinder, Dkt. 102.

23

The Court GRANTS IN PART and DENIES IN PART plaintiffs' Motion for Partial

24

ORDER - 1

Summary Judgment re: Valuation of Structure Damage and Personal Property Damage, Dkts. 82, and MetLife's Motion for Summary Judgment, Dkt. 85.

## II.      BACKGROUND

This action concerns a MetLife Homeowners insurance policy issued to the now-deceased plaintiff Rosemarie Taladay for her home located at 8702 Lawndale Avenue Southwest in Tacoma, Washington.  The homeowner's insurance policy includes property coverage for damage to Ms. Taladay's home caused by fire.  At the time of Ms. Taladay's death in May 2013, two of her three sons, Gary and Bernard Taladay, were living with her in the home.  Shortly after her death, Gary evicted Bernard from the residence.  Ms. Taladay's third son, plaintiff Denny Taladay, became the executor of Ms. Taladay's estate.[1]

On July 24, 2013, the Taladay home suffered an accidental fire in an upstairs attic room that had previously been occupied by Bernard.  The fire department's report provides that most of the fire damage was to the attic room where Bernard had previously resided, but water damage from the fire department's efforts to extinguish the fire and/or smoke damage was present on the first floor as well:

> 1st floor, no fire damage to 1st floor, limited mainly to water damage.  Stairwell leading up to 2nd floor had some smoke damage on the walls going up (Pic #12).  Upstairs to the right (Pic #14, 15, 16 17) shows heavy heat and smoke damage.  Lots of fire load, clothes, furniture, and trash mainly…

> Occupants [sic] mom owned the home but had passed 2 months ago.  Brother used to live upstairs but was kicked out of the house and had not lived upstairs for quite a while, he last visited about a week ago.  Insurance Company [sic] unknown (page 5).

---

[1] Denny Taladay, as personal representative of Ms. Taladay's Estate, and Gary Taladay are the plaintiffs in this action.  Bernard Taladay is not a party to this lawsuit.  Although JP Morgan Chase & Co. ("Chase" or "Chase bank") is identified on the docket as an interested party, Chase has not been involved in these proceedings to date.

ORDER - 2

Dkt. 85, Ex. 1 at 60-61 (West Pierce Fire and Rescue Report).

The insurance policy identifies several excluded Causes of Property Loss. "Water damage" is listed as one such exclusion, with the caveat that direct loss that ensues after water damage "caused by fire" is still covered under the policy:

> **Water damage**, meaning any loss caused by, resulting from, contributed to or aggravated by:
> 1. Flood, surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind;
> 2. Water or water-borne material which backs up through sewers or drains, or which overflows or is discharged from a sump pump, sump pump well or other system…
> 3. Water or waterborne material below the surface of the ground…
>
> This exclusion applies whether or not the water damage is caused by or results from human or animal forces or any act of nature.
>
> *However, we pay for direct loss that ensues after water damage if caused by fire, theft or explosion and then we pay only for the ensuing loss.*

Dkt. 85, Ex. 1 at F-2 (MET000852) (emphasis added). Another excluded cause of property loss identified in the policy that is relevant to the parties' dispute in this case is "[n]eglect by you to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered by a peril insured against." *Id*. at F-3 (MET000853).

It is undisputed that Gary Taladay, as a relative of the only named insured, Rosemary Taladay, who was living in the home at the time of the fire, constituted an "unnamed insured" under the insurance contract and is entitled to all corresponding policy benefits. On December 17, 2015, plaintiffs also exercised their option to have personal property owned by prior guests of the residence, including Bernard and Denny Taladay, covered by their insurance policy.

ORDER - 3

After the fire, Gary Taladay had difficulty discovering the identity of Ms. Taladay's insurance company, in part because he was neither the named insured nor the executor of her estate.  The parties disagree as to exactly what transpired after the fire with respect to plaintiffs' efforts to promptly report the fire to MetLife, but they agree that MetLife received notice of the incident from Dimont & Associates ("Dimont") on May 30, 2014, over ten months after the fire.[2]  Dkt. 85, Ex. 6 (Simionidis Dep); Dkt. 93, Ex. 1 (Dimont & Associates' May 20, 2014 Fax to MetLife providing Notice of Claim regarding "Fire causing damage to Dwelling").

It is also undisputed that MetLife did not pay any portion of plaintiffs' claim for insurance proceeds under the policy until at least April 2015, which appears to have been six months after MetLife concluded its coverage investigation on September 11, 2014. *See* Dkt. 16, Ex. S (9/11/2014 claim notes entry by investigator James Lindsay "recommending a routine handling of the claim" now that "[t]his investigation is now complete.").  Specifically, no payments were made until MetLife paid the mortgagee, Chase bank, $52,501.46 for structure damage to the house caused by the fire in April 2015.  Dkt. 85, Ex. 8 (check to Chase for $51,050.82, which was received by Chase on April 27, 2015).[3]  No payments were made directly to the plaintiffs until May 2015, when MetLife made its first of two loss of use benefits payments to Gary Taladay.  Dkt. 40, Ex. 1 (May 18, 2015 letter from MetLife stating that Gary Taladay will be receiving a check in the amount of $9,460.00 for four months loss of use); *see also* Dkt. 44 (Court Order

---

[2] Dimont is a third-party company hired by Chase bank to inspect the property when the loan went into default in April 2014.

[3] MetLife asserts that a supplemental payment was subsequently issued to Chase, bringing the total payment to $52,501.46.

dated June 23, 2015 directing MetLife to re-issue the $9,460.00 check after plaintiffs did not receive it).

On August 20, 2014, MetLife removed the matter to this Court. Dkt. 1. On April 29, 2015, plaintiffs filed an Amended Complaint alleging that MetLife did not fully compensate them under the insurance contract for (1) the full amount necessary to repair the structure of plaintiffs' home, (2) the damage to their personal property contained in the house, or (3) the cost of their additional living expenses and alternative home. Dkt. 29, Ex. 1 at 3. Plaintiffs further assert causes of action for violation of the Washington Consumer Protection Act ("CPA"), RCW Chapter 19.86 *et seq.*, bad faith, and violations of the Washington Insurance Fair Conduct Act, RCW 48.30.015 ("IFCA"). *Id*. at 3-4.

On March 25, 2015, the Court granted a prior motion for partial summary judgment filed by plaintiffs confirming that the damage to the late Ms. Taladay's residence resulting from the accidental fire was a covered cause of loss under her insurance policy. Dkt. 28.[4] On June 23, 2015, the Court ordered MetLife to re-issue a check in the amount of $9,460.00 to Gary Taladay for four months of loss of use of the Taladay residence, along with two checks for smaller sums owed to Heritage Restoration and 1-800-BoardUp. Dkt. 44.[5] By Order dated October 16, 2015, the Court ordered MetLife to issue a check in the amount of $24,161.00 as reimbursement to Gary Taladay for loss of use of the home since the fire. Dkt. 66. Finally, on December 18, 2015, the

---

[4] MetLife conceded the that "accidental fire is a covered cause of loss" under the subject contract, but argued that it could not make a coverage determination as to specific loss to covered property until plaintiffs submitted an inventory of damaged property and receipts for additional living expenses. Dkt. 18 at 7-11.

[5] As part of that Order, the Court noted that "plaintiffs' acceptance of the $9,460.00 for the incurred cost of living in a motel as a result of the covered fire damage does not constitute a waiver of any claim Mr. Taladay may have that a larger sum is owed under the terms of the policy." *Id*. at 2 fn.2.

1   Court granted in part and denied in part plaintiffs' motion to compel production of an

2   unredacted copy of the claim file in this case.  Dkt. 84.

3         Currently before the Court are two motions for partial summary judgment filed by

4   plaintiffs, one motion for partial summary judgment filed by MetLife, and one motion for

5   joinder filed by MetLife.[6]  Plaintiffs' first motion contends that MetLife's handling of

6   plaintiffs' insurance claim was unreasonable and therefore violated IFCA, breached

7   MetLife's duty of good faith, and violated Washington's CPA.  Dkt. 79.  Plaintiffs'

8   second motion asks the Court to make several factual findings as a matter of law with

9   respect to the value of the Taladays' covered property, including structure damage,

10  damage to personal property, and the applicable contract limit for plaintiffs' personal

11  property.  Dkt. 82.  MetLife also asks the Court to find that MetLife has satisfied its

12  obligation to pay for structure damage by paying actual cash value ("ACV") to Chase

13  bank, and that Bernard Taladay is now a first-party insured under the policy.  Dkt. 85.

14  Finally, MetLife moves to join Bernard Taladay as a necessary party.  Dkt. 102.

15                          III.     DISCUSSION

16      A.     <u>Summary Judgment Standard</u>

17        On a motion for summary judgment, the court must draw all inferences from the

18  admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred*

19  *Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000).  A moving party is entitled to summary

20  judgment when there are no genuine issues of material fact in dispute and the moving

21  party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

22

23        [6] Although MetLife's first motion is titled "Motion for Summary Judgment,"
    MetLife is only seeking partial summary judgment in this case.  MetLife does not, for
    example, ask the Court to dispose of plaintiffs' IFCA, bad faith, and CSA claims as a
24  matter of law, but argues that genuine issues of material fact preclude summary
    judgment.  Dkt. 85.

*Catrett*, 477 U.S. 317, 323 (1986).  An issue of fact is "genuine" if it constitutes evidence

with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  That genuine issue of fact is "material"

if it "might affect the outcome of the suit under the governing law." *Id.*

In response to a properly supported summary judgment motion, the nonmoving

party may not rest upon mere allegations or denials in the pleadings, but must set forth

specific facts demonstrating a genuine issue of material fact for trial and produce

evidence sufficient to establish the existence of the elements essential to his case. *See*

Fed. R. Civ. P. 56(e).  A mere scintilla of evidence is insufficient to create a factual

dispute. *See Anderson*, 477 U.S. at 252.

B.  Plaintiffs' Motion for Partial Summary Judgment Regarding the Insurance
Fair Conduct Act, Bad Faith, and the Consumer Protection Act

Plaintiffs' claims that MetLife has violated IFCA, breached the duty of good

faith, and violated the CPA are all based upon the same factual allegations that MetLife

acted unreasonably by doing the following: (1) failing to respond to plaintiffs' inquiries

as to whether MetLife was covering the claim, thereby forcing plaintiffs to initiate this

action and file numerous motions to preserve their rights under the policy, (2) failing to

advise Gary Taladay his right to Loss of Use benefits under the policy and then denying

such benefits until the Court ordered payment, (3) adjusting the structure claim with

Chase bank instead of plaintiffs, (4) concealing an inventory list of damaged personal

property items generated by a company called Enservio for MetLife and demanding that

plaintiffs create a list of those same items, and (5) failing to timely pay the structure

damage, personal property damage, and loss of use coverage under the policy.  Dkt. 79.[7]

MetLife responds that genuine issues of material fact preclude a finding that MetLife

violated its common law and statutory duties to the plaintiffs as a matter of law.  Dkt. 89

at 6-9.

### 1.  Washington Insurance Fair Conduct Act

IFCA provides that "[a]ny first party claimant to a policy of insurance who is

unreasonably denied a claim for coverage or payment of benefits by an insurer may bring

an action . . . to recover the actual damages sustained, together with the costs of the

action, including reasonable attorney's fees and litigation costs...."  RCW 48.30.015(1).

A court "may, after finding that an insurer has acted unreasonably in denying a claim for

coverage or payment of benefits or has violated [certain insurance regulations], increase

the total award of damages to an amount not to exceed three times the actual damages."

RCW 48.30.015(2).  A court "shall, after a finding of unreasonable denial of a claim for

coverage or payment of benefits, or after a finding of a violation of a rule in subsection

(5) of this section, award reasonable attorney's fees and actual and statutory litigation

costs, including expert witness fees, to the first party claimant of an insurance contract

who is the prevailing party in such an action."  RCW 48.30.015(3).  Thus, the statute

provides a list of violations that give rise to treble damages or to an award of attorney's

fees and costs; this list includes violations of Washington Administrative Code ("WAC")

---

[7] Plaintiffs also argue that MetLife acted unreasonably by refusing to communicate with plaintiffs' contractor Heritage Restoration about the cost of repairing the structure and replacing and cleaning the personal property.  However, MetLife has presented deposition testimony showing that Heritage Restoration was demanding payment of a severely inflated invoice before it would allow MetLife to inspect the Taladays' property in its possession.  As Heritage Restoration is not a party to this action, the Court declines to wade into the ongoing dispute between MetLife and Heritage Restoration in order to opine as to the reasonableness of MetLife's conduct as to that company.

provisions 284–30–330, 350, 360, 370, and 380.  RCW 48.30.015(5).  However, "an

insured cannot base an IFCA claim purely on a violation of Washington's insurance

regulations."  *Cedar Grove Composting, Inc. v. Ironshore Specialty Ins. Co.*, No. 14-

1443-RAJ, 2015 WL 3473465, *6 (W.D. Wash. June 2, 2015).[8]  Rather, plaintiffs must

"allege[] the trigger for an IFCA suit – an unreasonabl[e] deni[al] [of] a claim for

coverage or payment of benefits…" *Id.* (quoting RCW 48.30.105(1)).[9]

   This Court has recognized that "a refusal to pay a demand for coverage

reasonably promptly is an unreasonable denial of benefits, even if only temporary."  *Id.*

*See also Freeman v. State Farm Mut. Auto. Ins. Co.*, No. 11-761-RAJ, 2012 WL

2891167, at *3 (W.D. Wash. July 16, 2012) ("For purposes of an insured's

extracontractual claim, a failure to pay the amount the insured requests is a denial of

coverage.  Were it otherwise, an insurer could avoid extracontractual liability merely by

---

[8] There is a split in authority between the Western and Eastern Districts of
Washington interpreting IFCA with respect to the issue of whether an insured must show
that the insurer unreasonably denied a claim for coverage or payment of benefits before
stating a claim under IFCA, or whether a violation of the enumerated WAC provisions
cited in RCW 48.30.015(5) also provide an independent and implied cause of action. *See
Langley v. Geico General Insurance Co*., 89 F.Supp.3d 1083, 1091 (E.D. Wash. 2015)
(summarizing caselaw from both districts).  This Court follows the law of this district,
and finds that "[v]iolations of the regulations enumerated in RCW 48.30.015(5) provide
grounds for trebling damages or for an award of attorney's fees; they do not, on their
own, provide a cause of action [under IFCA] absent an unreasonable denial of coverage
or payment of benefits." *Weinstein & Riley, P.S. v. Westport Ins. Corp.*, No. C08-1694-
JLR, 2011 WL 887552, *29 (W.D. Wash. March 14, 2011) (citing RCW 48.30.015(1)).
*See also Travelers Indem. Co. v. Bronsink,* No. C08–1524JLR, 2010 WL 148366, at *2
(W.D. Wash. Jan 12, 2010).

[9] Plaintiffs allege in their motion that "MetLife's violations of the WAC
regulations also constitute a separate basis for finding that MetLife violated the IFCA."
Dkt. 79 at 23-24 (citing the WAC provisions identified in RCW 48.30.015(5)).  The
Court rejects that argument, as discussed above.  However, during oral argument
plaintiffs' counsel clarified that their IFCA claim is primarily based upon MetLife's
failure to promptly pay the claim after MetLife's investigator, Mr. Lindsay, completed
his coverage investigation on September 11, 2014 and recommended normal processing
and payment of the claim.

conceding coverage, paying its insured one dollar, and refusing to pay any more."). As this Court previously held when considering whether the language "denial of payment of benefits" requires an outright refusal by the insurer to pay a specific benefit promised by the policy or whether an unreasonably low payment also triggers the statute:

> [A]n insurer cannot escape IFCA simply by accepting a claim and paying or offering to pay an unreasonable amount. The benefits to which the first-party insured is entitled are generally described as payment of the reasonable expenses or losses incurred as a result of an insured event. Where the insurer pays or offers to pay a paltry amount that is not in line with the losses claimed, is not based on a reasoned evaluation of the facts (as known or, in some cases, as would have been known had the insurer adequately investigated the claim), and would not compensate the insured for the loss at issue, the benefits promised in the policy are effectively denied. If, on the other hand, the insurer makes a reasonable payment based on the known facts or is making a good faith effort to appropriately value the loss, the fact that the insured did not immediately get all of the benefits to which it may ultimately be entitled does not establish an "unreasonable denial of payment of benefits."

*Morella v. Safeco Ins. Co. of Illinois*, No. 12-0672-RSL, 2013 WL 1562032, at *3 (W.D. Wash. April 12, 2013).

Thus, under IFCA the question is whether MetLife's conduct amounted to an unreasonable denial of a claim for coverage or payment of benefits to which plaintiffs were entitled under the policy. Plaintiffs allege that MetLife's failure to promptly pay their claim after MetLife's investigator, Mr. Lindsay, completed his coverage investigation on September 11, 2014 and recommended normal processing of the claim, amounted to an unreasonable denial of payment under IFCA.

### 2.  Washington Consumer Protection Act and Good Faith

Washington's CPA prohibits "[u]nfair methods and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. To prevail in an action under the CPA, plaintiffs must establish that (1) MetLife was engaged in an unfair

or deceptive act or practice, (2) occurring in trade or commerce, (3) that impacts the

public interest, (4) plaintiffs have suffered injury in their business or property, and (5) a

causal link exists between the unfair or deceptive act and the injury suffered by plaintiffs.

*Panag v. Farmers Ins. Co. of Washington*, 166 Wash.2d 27, 37, 204 P.3d 885 (2009).

The first two elements of a CPA action may be satisfied by a legislatively declared per se

unfair trade practice.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co*., 105

Wash.2d 778, 791, 719 P.2d 531 (1986).  A per se unfair trade practice exists when, by

statute, the Legislature declares an unfair or deceptive act in trade or commerce and the

statute has been violated.

The Washington Administrative Code provisions governing insurers' conduct

operates as such as statute.  In other words, a single violation of any one of the WAC

regulations governing insurer conduct is an unfair or deceptive act or practice under the

CPA.  *Anderson v. State Farm Mut. Ins. Co.*, 101 Wash. App. 323, 331, 2 P.3d 1029

(2000) (citing *Industrial Indem. Co. v. Kallevig*, 114 Wash.2d 907, 924, 792 P.2d 520

(1990)).[10]  In addition, the public interest element of a CPA claim may be satisfied by a

_____

[10] Relevant to plaintiffs' claims in this case, WAC 284-30-370 requires prompt investigation of a claim by requiring that "every insurer must complete its investigation of a claim within thirty days after notification of the claim, unless the investigation cannot reasonably be completed within that time." This provision does include the caveat that "[a]ll persons involved in the investigation of a claim must provide reasonable assistance to the insurer in order to facilitate compliance with this provision."  In addition, WAC 284-30-330 defines nineteen "specific unfair claims settlement practices." WAC 284-30-330(1) prohibits an insurer from "misrepresenting pertinent facts or insurance policy provisions."  WAC 284-30-330(2) prohibits an insurer from "failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies."  WAC 284-30-330(4) prohibits an insurer from "refusing to pay claims without conducting a reasonable investigation," and WAC 284-30-330(7) prohibits "compelling a first party claimant to initiate or submit to litigation . . . to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings."  In addition, WAC 284-30-330(6) prohibits "not attempting to good faith to effectuate prompt, fair and

ORDER - 11

showing that a statute has been violated which contains a specific legislative declaration of public interest impact.  The insurance code begins with such a declaration, acknowledging that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters."  RCW 48.01.030.

Thus, the legislature's specific declaration of public interest in insurance matters makes an insurer's violation of the duty of good faith under RCW 48.01.030 a per se violation of the public interest requirement of a CPA claim.  *Hangman Ridge*, 105 Wash.2d at 791.  Similarly, a violation of any one of the regulations set forth in WAC 284-30-300 through 800 constitute a breach of the insurer's duty of good faith.  *Rizzuti v. Basin Travel Service of Othello, Inc*., 125 Wash. App. 602, 615-16, 105 P.3d 1012 (2005).  Under Washington law, whether an insurer acted in good faith in administering a claim depends on the reasonableness of its actions.  *Gingrich v. Unigard Sec. Ins. Co*., 57 Wash.App. 424, 433-34, 788 P.2d 1096 (1996).

### 3.  Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' IFCA, Good Faith, and CPA Claims

As noted above, plaintiffs' IFCA, good faith, and CPA claims are interrelated, and based upon the same alleged factual allegations.  MetLife acknowledges that violations of the WAC provisions discussed above constitute per se violations of its duty of good faith as well as Washington's CPA.  Dkt. 89 at 6.  However, MetLife contends that reasonable minds could disagree as to whether its conduct in adjusting the plaintiffs'

---

equitable settlements of claims in which liability has become reasonably clear[.]"  Finally, WAC 284-30-330(13) prohibits "failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law or denial of a claim or for the offer of a compromise settlement."

claims has been reasonable, or establish violations of IFCA, the CPA, or its duty of good faith.[11]

### i. *Compelling Plaintiffs to Initiate Litigation to Recover Amounts Due Under the Policy*

The Washington insurance regulations identify "[c]ompelling a first party claimant to initiate or submit to litigation . . . to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings" as an unfair method of competition and an unfair or deceptive act or practice in the settlement of insurance claims.  WAC 284–30–330(7).

Plaintiffs contend that MetLife's conduct in this matter falls squarely within this regulation, as the lead adjuster assigned to plaintiffs' case, Mr. Berglund, knew the plaintiffs would be compelled to file a lawsuit when he declined to extend the deadline for plaintiffs to file suit under the policy in July 2014.  Dkt. 79 at 22.  Specifically, plaintiffs would lose their right to sue under the policy if they did not file a lawsuit by July 24, 2014, the one-year deadline for filing any lawsuit.  On July 17, 2014, however, Mr. Berglund advised plaintiffs' counsel that MetLife "will not grant an extension to file suit against us beyond the stated 12 months."  Dkt. 16, Ex. M.  In addition, MetLife failed to make any offer to settle the claim prior to compelling plaintiffs to file suit.  *Id.* Instead, plaintiffs argue that MetLife failed to respond to plaintiffs' repeated inquiries as to whether MetLife was covering the claim, thereby forcing plaintiffs to initiate this action and file numerous motions to preserve their rights under the policy.

---

[11] Specifically, MetLife contends that "a genuine issue of material fact exists as to whether [MetLife] acted in good faith in its investigation of the Taladays' claim and whether [MetLife] violated WACs 284-30-370, 284-30-330(4), or 284-30-330(7)."  Dkt. 89 at 5-6.  Similarly, MetLife contends that "a genuine issue of material fact exists as to whether [MetLife] unreasonably delayed the Taladays' claim and whether [MetLife] violated WACS 284-30-330(2), 284-30-330(6), and 284-30-330(13)."  *Id.* at 6.

1          Finally, plaintiffs point out that they have already received substantially more

2    money for the Loss of Use coverage ordered by the Court than the zero dollars offered by

3    MetLife prior to plaintiffs filing this lawsuit, and Chase bank is holding the structure

4    damage funds in escrow for plaintiffs to use to repair the house or perhaps pay down the

5    mortgage loan owed by the Estate.  *Id*. at 22-23.  Thus, as MetLife offered plaintiffs zero

6    dollars to resolve their claim prior to this lawsuit, MetLife offered "substantially less than

7    the amounts ultimately recovered" in this action to date.  WAC 284–30–330(7).

8          MetLife responds that plaintiffs' inaction, and not MetLife's, prevented the

9    prompt processing of plaintiffs' claim.  Dkt. 89 at 2-3.  MetLife argues that "[a]part from

10   the single June 9, 2014 meeting with Mr. Berglund, plaintiffs failed to respond to any

11   correspondence or requests for information until [plaintiffs' counsel's] notice of

12   representation on July 11, 2014 and his threat or suit three days later [on] July 15, 2014."

13   *Id*. at 3.  MetLife points out that plaintiffs filed suit only 48 days after the claim was

14   presented.  *Id.*  MetLife further argues that it repeatedly responded to plaintiffs' inquiries

15   "both through formal discovery, communications between counsel, and from Mr.

16   Berglund that in order to move this claim forward the Taladays needed to present

17   [MetLife] with an inventory of items claimed."  *Id*. at 4.[12]

18         To support these contentions, the lead adjuster Tim Berglund has provided a

19   declaration describing his communications with the plaintiffs and their counsel.  Mr.

20   _____

21        [12]  As support for this contention, MetLife attaches a December 19, 2014 letter
     sent from MetLife's counsel to plaintiffs' counsel explaining that MetLife was adjusting
22   the claim as a covered loss, but plaintiffs must provide an inventory of lost or damaged
     items.  Dkt. 92, Ex. 1.  However, the Court is unpersuaded that a letter dated December
23   2014, approximately five months after plaintiffs had to file suit to protect their rights
     under the policy and two months after MetLife completed its coverage investigation,
24   demonstrates that MetLife's conduct prior to July 2014 did not compel plaintiffs to
     initiate this lawsuit in July 2014.

ORDER - 14

1    Berglund asserts that MetLife sent plaintiffs two letters dated June 4, 2014.  The first

2    letter advised plaintiffs what they must do in the event of a claim and described the

3    coverages available,[13] and the second letter notified plaintiffs that there was "a potential

4    coverage problem for [their] recent claim" and that plaintiffs needed to be aware that

5    MetLife was investigating the claim under a Reservation of Rights.  Dkt. 93, Ex. 3.  *See*

6    *also* Dkt. 93 (Berglund Decl.) at ¶ 6.  On July 11, 2014, Mr. Berglund sent Denny

7    Taladay a Proof of Loss form, and requested that it be returned within sixty (60) days.

8    Dkt. 93 (Berglund Decl.) at ¶ 11.  *See* Dkt. 93, Ex. 7.  When this form was not returned to

9    MetLife within one month, Mr. Berglund sent plaintiffs' counsel a second Proof of Loss

10   form on August 13, 2014.  Dkt. 93 (Berglund Decl.) at ¶ 14.  *See* Dkt. 93, Ex. 11. When

11   the proof of loss form was returned to MetLife in September, Denny Taladay had

12   indicated that actual cash value, whole loss and damage (including applicable sales tax),

13   and total amount claimed under the policy were "unknown" to him at the time.  Dkt. 93

14   (Berglund Decl.) at ¶ 15.  *See* Dkt. 93, Ex. 13.

15         As a threshold matter, the Court notes that Mr. Berglund's declaration contains

16   several inaccuracies that are, to say the least, perplexing.  For example, although Mr.

17   Berglund states that when Denny Taladay returned the sworn statement of proof of loss

18   on September 3, 2014, "Gary Taladay declined to provide any information as to his

19   Additional Living Expenses or if he elected ALE or Fair Rental Value of the house," this

20   representation is highly misleading.  Dkt. 93 at ¶ 15.  The Proof of Loss form did not

21

22         [13] The first letter simply advised the policy holder to "take the proper precautions
     to protect your family and secure your property," provided "a summary of your policy
23   coverage" that listed the policy limits for dwelling ($134,484), private structures
     ($26,897), contents ($94,139), loss of use ($33,621), policy deductible ($500), liability
24   ($500,000), and medical payments ($5,000).  Dkt. 93, Ex. 2.  It did not, for example,
     explain how to file a claim.

1   specifically ask whether plaintiffs were claiming loss of use benefits or fair rental value,

2   and plaintiffs did identify Gary Taladay as the sole occupant of the house at the time of

3   the fire.  Dkt. 93, Ex. 13.

4         Moreover, the Court is troubled by Mr. Berglund's assertion that when he

5   received the July 15, 2014 letter from Mr. Hansen informing MetLife of plaintiffs'

6   intention to file suit, Mr. Berglund "did not inform Mr. Hansen that [MetLife] would not

7   extend the suit limitation guideline, nor is it within my authority to make that decision."

8   Dkt. 93 at ¶ 13.  Plaintiffs have previously provided the Court with a copy of the July 17,

9   2014 letter from Mr. Berglund to plaintiffs' counsel advising him that MetLife "will not

10  grant an extension to file suit against us beyond the stated 12 months."  Dkt. 16, Ex. M

11  (quoting the policy language in the "the HP7000 (0902) module" stating that "Under

12  Section I of this policy, any suit or action seeking coverage must be brought within

13  twelve months of the loss.").  Mr. Berglund's statement to the contrary in his declaration

14  is therefore blatantly inaccurate based upon the record before the Court.

15        Finally, the second letter Mr. Berglund sent plaintiffs dated June 4, 2014 advised

16  that there was "a potential coverage problem for [their] recent claim" and that plaintiffs

17  needed to be aware that MetLife was investigating the claim under a Reservation of

18  Rights.  Dkt. 93, Ex. 3.  Mr. Berglund then quoted the following "conditions" language

19  from the policy: "We have no obligation to provide coverage under this policy if you or

20  your representative fail to comply with the following duties[:] A. Immediately notify us

21  or our representative [of the loss]" or "B. Protect the property from further damage, make

22  reasonable and necessary repairs required to protect the property and keep a record of

23  necessary expenditures."  *Id.*  It is difficult to square such a letter with Mr. Berglund's

24  assertion in this declaration that "[a]t no time did I state or indicate in any way to the

Taladays that this was not a covered loss.  At no time did I say to Gary Taladay or anyone else that the claim is not likely covered."  Dkt. 93 (Berglund Decl.) at ¶ 17.  On the contrary, the plaintiffs could reasonably conclude, based upon Mr. Berglund's letter identifying "a potential coverage problem for [their] recent claim," that the loss may not be covered under the policy because MetLife would potentially deny coverage under its Reservation of Rights.

Accordingly, the Court finds the competing accounts of the initial communications that took place between plaintiffs, Mr. Berglund, and plaintiffs' counsel present a genuine issue of material fact as to whether MetLife's conduct effectively compelled plaintiffs to file suit in order to receive payments due under the policy.  This issue, in particular, should be explored in greater detail at trial.

ii.      *Misrepresenting Loss of Use Benefits to Gary Taladay*

Plaintiffs claim that MetLife violated WAC 284-30-330(1) by failing to disclose the Loss of Use benefits to Gary Taladay.  Dkt. 79 at 21.  WAC 284-30-330(1) provides that "[n]o insurer shall fail to fully disclose to first party claimants all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented."

There remains a genuine issue of material fact with respect to whether Mr. Berglund failed to inform Gary Taladay of his Loss of Use benefits under the insurance policy, or the assigned MetLife investigator James Lindsay misrepresented to Mr. Taladay that he was not an insured under the policy.[14]  Specifically, it is undisputed that

_____

[14] Mr. Lindsay was apparently assigned to conduct a "special investigation" into whether the Taladays had failed to cooperate or otherwise breached the insurance contract.  Confusingly, Mr. Berglund states in his declaration that his own "investigation, and the investigation of [MetLife's] SIU adjuster James Lindsay, is that the fire is

Mr. Berglund and Mr. Lindsay met with the Taladays and their contractor, Danny

Anderton of Heritage Restoration, at the home nearly one year after the fire on June 9,

2014.  Plaintiffs assert that Mr. Berglund never informed Gary Taladay that he was

entitled to Loss of Use coverage benefits under the policy, or offered him a choice

between additional living expenses and fair rental value, despite Mr. Berglund's

awareness that the fire had forced him to move out of the home.  Gary Taladay asserts

that he "told them that I have been living in the house and that I was not living in a motel

as a result of the fire.  One of the investigators for MetLife said I was not covered for the

cost of living, the motel, or food, because I wasn't named of (sic) the policy."  Dkt. 79

(G. Taladay Decl.) at ¶¶ 2-3.  Gary Taladay further asserts that "[n]obody from MetLife

told me that I was owed money for the time I spent in the motel.  Nobody from MetLife

asked me for receipts from the motel . . . [or] told me I had the choice of getting payment

for my additional living expenses or the fair rental value of the house."  *Id.* at ¶ 4.

      MetLife disputes plaintiffs' account of this interaction.  Dkt. 89 at 3.  During his

deposition, Mr. Berglund testified that although he knew that Gary had been displaced by

the fire, he could not specifically remember whether he had disclosed the Loss of Use

benefit or explained the available options to Gary Taladay.  Dkt. 79, Ex. A (Berglund

Dep.) at 83:8-84:24, 86:6-89:13.  However, Mr. Berglund testified that "I know for a fact

that there was a good amount of time that we spend in his driveway going over it,"

meaning "the loss and the procedures and things like that," but Mr. Berglund could not

---

accidental, which is a covered loss under the Policy.  On July __, 2014 Mr. Lindsay
recommended routine handling of the claim."  Dkt. 93 (Berglund Decl.) at ¶5 (date gap in
original).  As Mr. Berglund failed to fill in the date the investigation was concluded in his
declaration, and plaintiffs represented during oral argument that Mr. Lindsay's
investigation was not actually completed until September 2014 based upon notes in the
MetLife claim file, this remains a question of fact to be resolved at trial.

recall "what all was covered verbally at that point in time." *Id*. at 86:9-87:1.  He also testified that at the time he met with Gary, he was not sending out a letter explaining the available loss of use options to the insured, although that has since become his standard practice to avoid any confusion.  *Id*. at 87:3-10.

After his deposition, Mr. Berglund's recollection of his interaction with Mr. Taladay appears to have improved.  He states in his declaration that "[a]t no time did I tell any of the plaintiffs herein that this loss was not covered, or that their claim would not likely be covered.  During my inspection of the loss on June 9 and 10, 2014 . . . I had a lengthy conversation with Gary and Bernard Taladay in front of the house, during which I explained to them the claim process, what Metropolitan would need from them in order to assist in our investigation, and I explained the coverages available under the policy to Gary Taladay including Actual Cash Value/Rental Value."  Dkt. 90 (Berglund Decl.) at ¶ 2.

The parties' differing accounts of Mr. Berglund's representation of "pertinent facts or insurance policy provisions" to Gary Taladay during their meeting at the property, and whether MetLife adequately instructed Mr. Taladay on how to obtain the loss of use payments owed to him, presents a genuine dispute of material fact to be resolved at trial.

     iii.  *Adjusting the Structure Claim With Chase Bank Instead of the Plaintiffs*

The parties disagree regarding the reasonableness of MetLife's refusal to negotiate and pay the structure damage claim to the Taladays rather than the mortgagee. Plaintiffs allege that MetLife's failure to communicate directly with plaintiffs to settle the structure claim violated their obligations to the insured under the policy.  Dkt. 79 at 23.

1    Plaintiffs further contend that by ignoring plaintiffs and instead adjusting the structure

2    claim with Chase bank, MetLife effectively ignored all the provisions of WAC 284-30-

3    330 through 380, which regulate the prompt investigation, communication, payment, and

4    settlement of claims.  *Id*.  During oral argument, plaintiffs also argued that MetLife's

5    conduct violated the express terms of the contract, which provided under "Settlement

6    Options" that "We will adjust all losses with you."  Dkt. 85, Ex. 1 at H-1 (Met000859).

7         MetLife responds that it acted reasonably by paying Chase bank, rather than

8    plaintiffs, for the structure damage to the house because the Lenders Loss Payable

9    provision of the policy entitles the mortgagee Chase to be paid ACV for structure damage

10   up to the limit of the mortgage before any ACV or RCV is paid to the insured.  Dkt. 85,

11   Ex. 1 at 50 (MET000882) (Lender's Loss Payable).  Specifically, the policy provides that

12   any loss or damage under the policy "shall be payable first to the loss payee or mortgagee

13   (hereinafter secured party) and second, to the insured, as their interests may appear;

14   PROVIDED, That, upon demand for separate settlement by the secured party, the amount

15   of said loss shall be paid directly to the secured party to the extent of its interest."  *Id.*

16        MetLife avers that at the time MetLife received notice of the fire from Dimont on

17   May 30, 2014, the residence had a mortgage through Chase bank.  At the time of the fire,

18   the unpaid principal of the mortgage was $86,987.65.  Dkt. 85, Ex. 7 (Chase payoff quote

19   providing that the total amount due to pay off the loan through July 23, 2014 is

20   $89,526.56).  MetLife estimated the ACV loss initially as $51,050.82, and later adjusted

21   it upward to $52,501.46.  MetLife argues that it was obligated to issue payment as

22   instructed by the mortgagee, Chase bank, and pursuant to those instructions properly

23   issued payment in April 2015 to "Dimont & Associates in trust for JPMorgan Chase N.A.

24   . . . for the account of ESTATE OF ROSEMARIE K. TALADAY."  Dkt. 85, Ex. 5.

ORDER - 20

Chase bank continues to hold the $52,501.46 in escrow in the event that plaintiffs wish to begin repair work on the property.  Dkt. 85, Ex. 6 (Simionidis Dep.) at 19:23-24.  Thus, MetLife argues that it has already fulfilled its obligation under the policy to pay for structure damage until plaintiffs actually begin repairs on the property, as MetLife does not owe replacement cost unless and until plaintiffs complete their repairs.

The Court agrees with MetLife that the mortgagee Chase, rather than plaintiffs, are entitled to receive ACV until repairs are made to the property by plaintiffs.  However, as discussed in greater detail below, genuine issues of fact remain as to whether MetLife's calculation of ACV for the structure damage was reasonable, in light of Mr. Berglund's decision to exclude payment for structure damage to the ground floor based upon his perception that plaintiffs failed to mitigate the water damage resulting from the fire.  Even though MetLife correctly paid ACV for the structure to Chase, the $52,501 amount may not have been reasonable.[15]  It also may not have been reasonable for MetLife to fail to communicate anything about that payment – or the basis for MetLife's ACV calculation – to plaintiffs, who still own the house and are entitled to use that money to make repairs to the property if they choose.  Accordingly, the Court declines to grant summary judgment on this claim.

---

[15] Indeed, the parties' prior filings in this case established that the $52,501 ACV payment are insufficient for plaintiffs to hire a contractor to repair the property to "like new" condition, and MetLife's own expert has testified that reasonable contractors will not undertake such a job unless they are confident the insurer will pay for all of the work necessary to make the house habitable.  As plaintiffs are unable to afford such repairs unless MetLife can assure payment in full, Mr. Berglund's decision to exclude loss to the first floor of the house rendered plaintiffs unable to undertake any such repairs.  The parties' experts' estimation of the cost to return the entire house (both floors) to "like new" condition were otherwise consistent.

1

2

       *iv.*  *Concealing Enservio Inventory List of Damaged Personal Property Items and Requiring Plaintiffs to Create Duplicative List*

3    Plaintiffs claim that MetLife violated WAC 284-30-360(4) by failing to

4 "promptly provide necessary claim forms, instructions, *and reasonable assistance* so that

5 first party claimants can comply with the policy conditions and the insurer's reasonable

6 requirements" upon "receiving notification of the claim."  Dkt. 79 at 22 (emphasis

7 added).  Specifically, plaintiffs contend that MetLife never instructed plaintiffs on what

8 they needed to do to receive payment for their structure damage and their loss of use

9 benefits, but instead demanded that they provide a list of every damaged item in the

10 house, while refusing to assist them with that process.  *Id.*  Meanwhile, MetLife also

11 failed to provide plaintiffs with a preliminary list that it had generated with the assistance

12 of Enservio in June 2014, and instead kept this list a secret from plaintiffs.  *Id.*

13    MetLife responds that it was plaintiffs' obligation to provide an inventory of lost

14 or damaged items, which MetLife explained to plaintiffs by letter dated December 19,

15 2014:

16     If I understand your letter, you believe MetLife has declined to make a coverage decision concerning the structure and personal property

17 claims.  This is not accurate.  MetLife continues to adjust the claim as a covered loss.  However, the continued adjustment of your client's claim is

18 contingent upon your client's willingness to present an inventory of loss or damaged items.  It is my understanding that your client has not prepared

19 complete of items being claimed….

     As to your request that MetLife agree to pay the cost of hiring a

20 professional to prepare an inventory of lost or damaged items, this is not a supplemental coverage under their policy.  The Taladays do have an

21 obligation under the policy to provide MetLife with sufficient information to adjust this loss.

22

Dkt. 92, Ex. 1.

23

24

ORDER - 22

1      During the hearing, MetLife further argued that the June 2014 Enservio list was

2  only a partial inventory created by Mr. Berglund working with Enservio, and that list was

3  never completed or made part of MetLife's claim file.   Thus, MetLife contends that the

4  Enservio list was not hidden from plaintiffs; it was simply not complete enough to be

5  used to adjust plaintiffs' claim.

6      The Court finds that it would benefit from further testimony regarding how

7  MetLife typically assists its insureds in completing their inventory of damaged property,

8  especially insureds who have not initiated litigation against MetLife.  Although Mr.

9  Berglund represents in his declaration that he offered to "assist" the Taladays in

10  presenting their claim, as quoted above, MetLife expressly rejected Mr. Hansen's direct

11  request that MetLife assist plaintiffs in preparing their Proof of Loss.  Even if the Court

12  were to accept defense counsel's argument that MetLife did not conceal the June 2014

13  Enservio list from plaintiffs, it is not altogether clear why MetLife did not, for example,

14  make the partial list available to plaintiffs to assist them in presenting their Proof of Loss.

15         *v.*    *Failure to Promptly Pay the Structure Damage, Personal*
*Property Damage, and Loss of Use Coverage in*

16                  *Accordance with WAC 284-30-330 and WAC 284-30-370*

17      Finally, plaintiffs argue that MetLife's failure to timely pay amounts due under

18  the policy ran afoul of several provisions of WAC 284-30-330 as well as WAC 284-30-

19  370.  Specifically, plaintiffs allege that MetLife violated WAC 284-30-370 by failing to

20  complete its investigation within thirty days after the notice of the claim, and refused to

21  communicate with plaintiffs' contractor Heritage Restoration about the cost of repairing

22  the structure and replacing and cleaning the personal property, *i.e.*, failed to conduct a

23  reasonable investigation into their claim pursuant to WAC 208-30-330(4).  As noted

24  above, MetLife does not dispute plaintiffs' evidence that no money was paid with respect

1   to the structure damage until at least six months after MetLife concluded its coverage

2   investigation on September 11, 2014.  *See* Dkt. 16, Ex. S (9/11/2014 claim notes entry by

3   investigator James Lindsay "recommending a routine handling of the claim" now that

4   "[t]his investigation is now complete."); Dkt. 85, Ex. 8 (MetLife check to Chase for

5   $51,050.82, marked as being received by Chase on April 27, 2015); Dkt. 40, Ex. 1 (May

6   2015 Loss of Use payment to Gary Taladay).

7        MetLife argues that it was not presented with notice of plaintiffs' claim until six

8   weeks before the one-year suit limitation period expired, and at that time "plaintiffs

9   refused to present a contents claim, the structure claim was payable to the mortgagee

10   pursuant to the mortgagee's instructions, and  . . . plaintiffs' loss of use claim was paid

11   when presented."  Dkt. 89 at 7.  MetLife asserts that it began its investigation into the

12   claim as soon as it was presented by Dimont, but "reasonable minds could differ as to

13   whether the delay in completing its investigation was caused by the Taladays' refusal to

14   present a claim, or by MetLife."  Dkt. 89 at 6.  For example, as noted above, WAC 284-

15   30-370 provides that an insurer must complete its investigation within thirty days – with

16   the caveat that "[a]ll persons involved in the investigation of a claim must provide

17   reasonable assistance to the insurer in order to facilitate compliance with this provision."

18   MetLife asserts that reasonable minds could disagree regarding whether plaintiffs

19   provided such assistance based upon their failure to prepare a list of damaged personal

20   property contents for many months after MetLife was notified of the fire.  In fact, to date

21   the plaintiffs have still refused to clarify which articles of claimed property belonged to

22   the deceased Rosemary Taladay, Gary Taladay, Denny Taladay, or Bernard Taladay.

23   Dkt. 92 (May Decl.) at ¶ 8.

24

The Court agrees with MetLife.   The reasonableness of MetLife's conduct, *i.e.,* failure to promptly pay for structure damage, personal property damage, and loss of use coverage for months after MetLife concluded its investigation, depends in large part upon whether plaintiffs provided "reasonable assistance" to facilitate adjustment of their claim. Genuine issues of material fact preclude summary judgment on this claim.

Accordingly, plaintiffs' motion for partial summary judgment re: IFCA, Bad Faith and CPA Claims, Dkt. 79, is DENIED.  Plaintiffs may pursue these claims at trial.

C.   Cross-Motions for Partial Summary Judgment Regarding Damage to the Structure and Contents

Plaintiffs' second motion for partial summary judgment, and MetLife's motion for summary judgment, ask the Court to make several findings as a matter of law to narrow the issues for trial.  Dkt. 82; Dkt. 85.  Specifically, plaintiffs ask the Court to find that (1) the cost of repairing the covered structure damage is at least $125,028, (2) the cost of replacing the covered personal property is at least $171,420 and the actual cash value ("ACV") of the covered personal property is at least $99,624, and (3) the contract limit with respect to compensation for damaged personal property is $94,139.  Dkt. 82. MetLife asks the Court to find as a matter of law that MetLife properly calculated and paid the Actual Cash Value ("ACV") of the structure claim to the mortgagee, Chase bank, because MetLife owed ACV at the time of the loss under the "Coverage A – Dwelling" section of the policy until or unless actual repairs or replacement are completed.  Dkt. 85.

As a threshold matter, the Court notes that plaintiffs have conceded that MetLife is not responsible for code upgrades as part of the ACV payment under the policy.  As a result, MetLife's motion, Dkt. 85, is GRANTED in this regard.  Similarly, plaintiffs'

motion for summary judgment on the narrow issue of whether the insurance contract

limits plaintiffs' compensation for personal property damage to $94,139 is undisputed by

MetLife, and therefore GRANTED.  Dkt. 82 at 1.  *See also* Dkt. 79 at 148; Dkt. 93 at 12

("Summary of Coverage" which limits "contents" to $94,139).  As discussed below, the

parties' motions are otherwise DENIED.

Although neither party framed the issue clearly in their motions, the Court has

ascertained that the primary dispute of fact between the parties regarding structure and

personal property damage concerns whether MetLife must pay for the water damage to

the first floor of plaintiffs' house, or whether MetLife is relieved of this liability because

plaintiffs failed to mitigate the loss.  *See* Dkt. 85, Ex. 1 at F-2 (MET000852) (providing

that water damage caused by fire is a covered cause of loss); *id*. at F-3 (MET000853)

(providing that "[n]eglect by you to use all reasonable means to save and preserve

property at and after the time of a loss, or when property is endangered by a peril insured

against" is an excluded cause of loss).  To establish that plaintiffs failed to mitigate their

loss at trial, MetLife will have a very heavy burden to bear.  To date, MetLife has offered

argument, but only meager evidence.  However, as discussed below, the Court finds that

this underlying genuine issue of material fact precludes summary judgment on the

parties' remaining contentions.

### 1. *Payments for Structure Damage*

Plaintiffs ask the Court to find that the cost of repairing the covered structure

damage is at least $125,028.  Dkt.  82 at 3.  MetLife asks the Court to find that it has

already satisfied its obligations with respect to the structure damage to the house by

paying actual cash value, or ACV, to Chase bank in April 2015.  Dkt. 85 at 7-10.

The Court's analysis begins with the relevant language of the policy, which provides that MetLife "will pay the actual cash value at the time of the loss for the damaged property, but no more than the less of: (i) the amount required to repair or replace the damaged property with property of like kind and qualify; or (ii) the limit of liability applying to the property." Dkt. 85, Ex. 1 at 24.  "Actual cash value" is defined as the "amount which it would cost to repair or replace covered property with material of like kind and qualify, less allowance for physical deterioration and depreciation including obsolescence." Dkt. 85, Ex. 1 at 3.  The policy further provides that only "if you repair or replace the damaged or destroyed property, you may make further claim for any additional payments for Replacement Cost Settlement …" subject to other enumerated requirements and restrictions. *Id.*  In addition, the policy requires that MetLife pay the mortgagee, Chase bank, the ACV up to the limit of the mortgage before any ACV or RCV is paid to the insured.  Dkt. 85, Ex. 1 at 50 (Lender's Loss Payable).[16]

As discussed above, MetLife issued an ACV payment to Chase bank in the amount of $52,501.46 in April 2015. Dkt. 85, Ex. 8 (check); Dkt. 85, Ex. 9 (Tersuli Construction Services Estimate).  Chase has been holding the $52,501.46 in escrow in the event that plaintiffs wish to begin repair work on the property.  Dkt. 85, Ex. 6 at 19:23-24.  In light of this payment, MetLife argues that it has already fulfilled its obligation under the policy for structure damage until plaintiffs actually begin repairs, as MetLife does not owe replacement cost unless plaintiffs complete their repairs of the dwelling.

---

[16] Specifically, the policy provides that any loss or damage under the policy "shall be payable first to the loss payee or mortgagee (hereinafter secured party) and second, to the insured, as their interests may appear; PROVIDED, That, upon demand for separate settlement by the secured party, the amount of said loss shall be paid directly to the secured party to the extent of its interest." *Id.*

ORDER - 27

As discussed above, although the Court agrees with MetLife's interpretation of the policy language, a question of fact remains as to whether MetLife has correctly calculated the ACV amount for the structure damage because MetLife's adjuster Mr. Berglund apparently excluded from the ACV calculation proceeds for structure damage to the ground floor of the house.  Specifically, plaintiffs' evidence establishes that MetLife's expert witness, Tom Gibbons, initially estimated the cost of repairing the structure to be at least $122,528, plus $2,500 for building permits, $5,000 for engineering fees, minus $5,000 for code upgrades (which are excluded under the insurance contract), for a total of $125,028, plus the unknown cost of hazardous material remediation.  Dkt. 82 at 2; Dkt. 83 (Hanson Decl.), Ex. A at 26; Dkt. 83, Ex. B (Gibbons Dep.) at 15-16. Plaintiffs' expert witness, Danny Anderton, estimated that repairs will cost only slight more than Gibbons' estimate, $130,086.  Dkt. 83 (Hanson Decl.), Ex. C at 18.  Thus, the parties' experts are essentially in agreement with respect to the cost of repairing the house to "like new" condition, which is why plaintiffs ask the Court to find that the cost of repairs is at least $125,028 as a matter of law.

However, MetLife's expert, Mr. Gibbsons, actually prepared two estimates: one estimate which contemplated all repairs, whether covered by the policy or not (replacement cost $122,528.48, the "first estimate"), and a second estimate modified to reflect the scope of the "covered damages" under the policy and ACV following the application of depreciation (replacement cost $75,719.81/ACV $52,501.46, the "adjusted estimate").  *Id.* at 2.  *See also* Dkt. 98 (May Decl.), Ex. 1 (first estimate) and Ex. 2 (adjusted estimate).  Specifically, Mr. Gibbons testified that the adjustor, Mr. Berglund, asked him to modify his first estimate by "chang[ing] the scope of the work more or less leaving the finishes in the downstairs area" intact and therefore not gutting the ground

level of the house.  Dkt. 98, Ex. 4 (Gibbsons Dep.) at 28:2-12.  Mr. Gibbons testified that

he was instructed by Mr. Berglund not to include downstairs finishes in his adjusted

estimate, and also to "globally depreciate[] it by 15 years."  *Id*. at 29:2-20.  This is how

Mr. Gibbons calculated his adjusted estimate.

By contrast, Mr. Gibbsons' preliminary estimate to repair the house to like-new

condition included "no reduction or adjustment to this estimate for additional damage

that may have been caused [by] extended exposure to water, fire damage or the elements

over the two-year period following the fire."  Dkt. 98, Ex. 3 at ¶ 4 (Gibbons Decl.).  In

other words, Mr. Gibbons' preliminary estimate did not contemplate what defense

counsel referred to as "coverage issues" during oral argument, *i.e*., a substantial reduction

for plaintiffs' alleged failure to mitigate the loss to the ground floor of the house.

Although MetLife represented to the Court that Mr. Gibbons testified that a

substantial amount of the damage to the ground level of the house could have been

prevented if a mitigation contractor such as Heritage Restoration had properly dried

things out after the fire, the Court finds that MetLife overstates Mr. Gibbons' testimony.

During his deposition, Mr. Gibbons testified that if the house had been mitigated

immediately after the fire "they would have identified wet areas and removed wet areas

and dried things out, so that . . . the whole entire downstairs *may or may not have to have

been gutted*."  Dkt. 98, Ex. 4 (Gibbsons Dep.) at 21:18-22 (emphasis added).  He stated

that "[t]here's potential that some of those –like the bathroom may have been able to be

salvaged, some of the bedrooms may have, *maybe . . . it still may need to be gutted at the

end of the day, but if there was some mitigation done to it, there may have been some

areas that could have potentially been saved*."  *Id*. at 22:2-12 (emphasis added).  Without

more, Mr. Gibbons' deposition does not assure the Court that the loss to the ground floor

1   is attributable to the plaintiffs' failure to mitigate, and not simply water damage directly

2   caused by the fire.

3          Unfortunately, plaintiffs' expert, Mr. Anderton, does not lend any clarity to this

4   issue.  Mr. Anderton testified that in preparing his estimate of replacement cost, he did

5   not make any effort to exclude any damage that was made worse due to the house sitting

6   vacant for two years after the fire, or any damage that was not covered under plaintiffs'

7   insurance policy.  Dkt. 98, Ex. 5 (Anderton Dep.) at 40:23-41:5.  He testified that he has

8   "never seen their policy," and explained that "normally when I write these estimates, I

9   give them to the adjuster, the adjuster looks them over, and he will tell me what is or

10  what is not covered and then we go from there."  *Id*. at 41:10-15.  However, a review of

11  Mr. Anderton's estimate by the adjuster "never occurred in this case."  *Id*. at 41:15.  In

12  addition, Mr. Anderton testified that his estimate does not include depreciation, as

13  depreciation is not within his expertise, or ACV valuation.  *Id*. at 39:7-23.  Thus, Mr.

14  Anderton's replacement cost estimate does not take into account what is or is not covered

15  under the policy.

16         Although the Court agrees with plaintiffs' contention that "[e]very house fire that

17  is extinguished with fire hoses will sustain damage from water, corrosive smoke residue,

18  and mold growth during the days, weeks, and months following the fire," and "the

19  efficient proximate cause of that damage is the fire," plaintiffs fail to confront MetLife's

20  argument that plaintiffs should have done more to mitigate the loss to the ground floor of

21  the house caused by extended exposure to water and the elements in the ten months

22  following the fire.  Dkt. 95 at 2.  Plaintiffs also fail to provide any expert testimony

23  regarding an appropriate standard for depreciation, or ACV calculation.  Accordingly,

24  genuine issues of material fact preclude summary judgment.  Dkt. 82; Dkt. 85.

2.  *Payment for Damaged Personal Property*

Plaintiffs' expert witness concerning the personal property, Roger Howson, estimated that the cost of the fire-related damage to the personal property is $171,420, and that the ACV of the damage to the personal property is $99,624.  Dkt. 83 (Hanson Decl.), Ex. D (Howson Dep.) at 9:2-7 and E.  Plaintiffs contend that because the Court excluded MetLife's personal property witness Don Stafford as well as the Enservio list dated November 13, 2015 due to improper disclosure under the discovery rules, Mr. Howson has provided the only admissible expert opinion.[17]

MetLife contends that Mr. Howson's opinion is unreliable because he formed his opinion using photos and descriptions of the damaged items rather than personally inspecting them, employees assisted him in preparing the valuation, and he sometimes had to estimate the age of some items of personal property.[18]  Dkt. 88 at 5.  MetLife contends that "[w]ithout access to the actual contents and without necessary information from the Plaintiffs, it remains likely that the estimate includes pricing for items that were not damaged by the fire," as well as contents recovered from the main level of the property that were not damaged by the fire itself.  *Id.*

---

[17] Specifically, although MetLife disclosed Jon Douglas and Jeff Roach as experts regarding personal property, MetLife subsequently withdrew both of those experts.  Although MetLife directed plaintiff to take the deposition of Donald Stafford, a former employee of Enservio, he was not involved in the preparation of the November 2015 Enservio list and was not disclosed as an expert witness.  By Order dated January 13, 2016, the Court granted plaintiffs' unopposed motion to exclude Mr. Stafford from testifying as an expert witness in this matter.  Dkt. 99 at 4.  Mr. Stafford may only testify as to matters within his personal knowledge.  Similarly, the Court excluded the November 2015 Enservio list and valuation, as an expert opinion that was untimely produced by MetLife.  *Id.*

[18] MetLife also emphasizes Howson's testimony that it was sometimes necessary to guess or estimate the age of an item of personal property using what Mr. Howson calls the "WAGNER method," meaning "Wild Ass Guess Not Easily Refutable."  Dkt. 98, Ex. 5 (Howson Dep.) at 27:8-24.

1    However, plaintiffs point out that Enservio generated a similar list for MetLife in

2  June or July 2014 relying upon even less information, such as no photographs of the

3  items, and yet that list estimated age, pricing, and depreciation of each item.  Dkt. 95 at 4.

4  Plaintiffs maintain that Mr. Howson's method of estimating the value of personal

5  property damage is consistent with standard insurance industry practice, and there

6  remains no expert testimony in the record to oppose his opinion.

7    By claiming that Mr. Howson's "estimate was ultimately formulated using the

8  'WAGNER method,'" MetLife overstates Mr. Howson's testimony.  Mr. Howson

9  testified that "a WAGNER method of evaluation" was "sometimes use[d]" by his staff to

10 estimate the age of some items of personal property, explaining that "we try not to be too

11 far on the 'W' and the 'A.'  But we do use some…people that are professionals and

12 experts are able to take in information and, quite frankly, extrapolate a report based on

13 their inspection and based on the context in which they find themselves."  Dkt. 98, Ex. 6

14 (Howson Dep.) at 27:8-24.  Mr. Howson did not, as MetLife claims, testify that his entire

15 report was based on wild guesses.  MetLife has also not provided any expert testimony to

16 contradict Mr. Howson's expert report.

17    However, for the same reasons that the Court denied the parties' motions

18 regarding the structure damage, the Court DENIES plaintiffs' motion for summary

19 judgment regarding the cost of replacing the covered personal property and/or ACV of

20 that property.  Dkt. 82.  Resolution of this issue will depend, at least in part, upon

21 whether the personal property items on the first floor of the house are covered under the

22 policy.

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

D.  <u>MetLife's Motion to Join Bernard Taladay as a Necessary Party</u>

MetLife asks the Court to make a determination as a matter of law that Bernard

Taladay is now a first-party insured under the policy.  Dkt. 85 at 1.  In addition, MetLife

filed a separate motion for joinder of Bernard Taladay as a necessary party pursuant to

Fed. R. Civ. P. 19.  Dkt. 102.  Plaintiffs have not yet had an opportunity to respond.

Specifically, MetLife asserts that because Bernard Taladay lived upstairs in the

Taladay residence until he was evicted shortly before the July 24, 2013 fire, and the fire

department's report provides that most of the fire damage was to the attic room where

Bernard had previously resided, most of the personal property items damaged by the fire

itself most likely belonged to Bernard.  *See* Dkt. 85, Ex. 1 at 60-61 (West Pierce Fire and

Rescue Report).  MetLife asserts that the Total Loss Report produced by plaintiffs'

expert Heritage Restoration inventoried the contents of the entire home, 2025 items in all.

Dkt. 101 at 4.  MetLife determined that the ACV of all the items on the Total Loss

Report was $66,966.04.  Dkt. 102 at 2-3.  Although plaintiffs' counsel Mr. Hanson

currently represents three of the four Taladays (Gary, Denny and the Estate of Rosemary

Taladay), he does not represent Bernard Taladay.

MetLife contends that before plaintiffs informed MetLife that they were intending

to make a claim for Bernard's property, MetLife intended to issue a single check to the

three represented insureds, leaving out payment for items that were owned by Bernard.

However, plaintiffs' counsel advised MetLife that going through the 2025 items on the

June 8, 2015 Total Loss Report "may take some time to determine that information for

each item." Dkt. 85, Ex. 1 at 151.  MetLife informed plaintiffs' counsel that without a

certification of who owned what property, it could not issue a general check because if

any of the property belonged to Bernard, then he must be named on the check as well.  *Id.*

ORDER - 33

On December 17, 2015, plaintiffs' counsel informed MetLife and the Court that his clients intended to exercise their option to cover the property belonging to the prior guests of the house, including Bernard Taladay and Denny Taladay, and that they would inform MetLife of the precise amount that should be paid to each individual.  Dkt. 85, Ex. 2 at 144.  To date, however, it does not appear that any party has communicated with Bernard Taladay, and plaintiffs have not claimed their items from the 2025 items listed on their expert's Total Loss Report.  Dkt. 102 at 4.  Rather, plaintiffs asked MetLife to issue payment for the contents based not upon the items that each Taladays owned, but a percentage of the total (95% for plaintiffs' counsel's three clients and 5% for Bernard). *Id.* (citing Dkt. 85, Ex. 1 at 146).

MetLife contends that it cannot comply with plaintiffs' request, because once plaintiffs exercised the option to cover Bernard's property, he became a first party insured.  MetLife argues that complete relief cannot be accorded if Bernard Taladay is not joined as a party to this action, and the failure to join him puts MetLife at risk of multiple or inconsistent obligations with respect to his interest.  Dkt. 102 at 1.

Fed. R. Civ. P. 19 governs the compulsory joinder of parties needed for just adjudication.  To determine whether a party is required under Rule 19, the court must examine whether it can "award complete relief to the parties present without joining the nonparty."  *Paiute–Shoshone Indians of the Bishop Cmty. of the Bishop Colony, Cal. v. City of Los Angeles,* 637 F.3d 993, 997 (9th Cir. 2011) (internal quotations and citations omitted); *see* Fed. R. Civ. P. 10(a)(1)(A).  Alternatively, the court considers "whether the [non-party] claims a legally protected interest in the subject of the suit such that a decision in its absence will (1) impair or impede its ability to protect that interest; or (2) expose [the existing parties] to the risk of multiple or inconsistent obligations by reason

of that interest." *Dawavendewa,* 276 F.3d at 1155 (citing *Makah Indian Tribe,* 910 F.2d at 558); *see* Fed. R. Civ. P. 19 (a)(1)(B)(i)-(ii).  If the answer to either of these questions is affirmative, then the party is necessary and "must be joined" as a party.  Fed. R. Civ. P. 10(a)(1).  The issue of a party's alleged indispensability is sufficiently important that it can be raised at any stage of the proceeding, even *sua sponte.  McCowen v. Jamieson*, 724 F.2d 1421, 1424 (9th Cir. 1984).

Although the Court understands MetLife's concern, MetLife's motion to join Bernard as a necessary party, Dkt. 102, is DENIED.  The parties' dispute over form of payment for personal property loss can be resolved without joining Bernard Taladay as a party at this late stage of the litigation.  As discussed at oral argument on the pending motions, MetLife is ORDERED to issue a single check for the personal property items made out to all the first party insured, including Bernard Taladay, and in exchange for a release and hold harmless from the parties on this claim.  Plaintiffs' counsel can identify which items belonged to which residents or prior guests of the house, and ensure that each insured receives appropriate payment.

## IV.     CONCLUSION

Accordingly, the Court DENIES plaintiffs' Motion for Partial Summary Judgment Re: Insurance Fair Conduct Act, Bad Faith, and Consumer Protection Act, Dkt. 79, and MetLife's Motion for Joinder, Dkt. 102.  The Court GRANTS IN PART and DENIES IN PART plaintiffs' Motion for Partial Summary Judgment re: Valuation of Structure Damage and Personal Property Damage, Dkts. 82, and MetLife's Motion for Summary Judgment, Dkt. 85.

//

//

The Clerk is directed to send a copy of this Order to all counsel of record.

DATED this 11th day of February, 2016.

JAMES P. DONOHUE
Chief United States Magistrate Judge

ORDER - 36