1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

DENNY TALADAY, *et al.*,

9

Plaintiffs,

10

v.

11

METROPOLITAN GROUP PROPERTY
AND CASUALTY INSURANCE

12

COMPANY,

13

Defendant.

NO.  C14-1290-JPD

MEMORANDUM OPINION

14

15

I.      INTRODUCTION

16

This matter was tried to the Court, sitting without a jury, on April 25-28, 2016, and

17

June 13-14, 2016.[1]  Dkts. 118-23, 135-36.  This action concerns a Metropolitan Group

18

Property and Casualty Insurance Company ("MetLife") homeowners insurance policy issued to

19

the now-deceased plaintiff Rosemarie Taladay.  Shortly after Ms. Taladay's death, her home

20

suffered an accidental fire.  Two of Ms. Taladay's sons, Gary Taladay and Denny Taladay,[2]

21

bring this action against MetLife alleging that the company breached the contract by

22

23

[1] The Court continued the trial on April 28, 2016, due to unfortunate circumstances discussed on the record.  Dkt. 123.  Proceedings resumed a few weeks later on June 13, 2016.

24

[2] Denny Taladay brings this action individually and as the administrator of Ms. Taladay's Estate.  Ex. 96 (reflecting the parties' understanding to this effect).

MEMORANDUM OPINION - 1

1  wrongfully denying coverage, violated the Insurance Fair Conduct Act ("IFCA"),[3] Washington

2  Consumer Protection Act ("CPA"),[4] and breached the duty of good faith. Dkt. 29.

3        Specifically, plaintiffs allege that MetLife violated IFCA, the CPA, and breached the

4  duty of good faith by acting unreasonably in the following ways: (1) failing to promptly

5  respond to plaintiffs' inquiries as to whether MetLife was covering their claim, thereby forcing

6  plaintiffs to initiate this action and file numerous motions to preserve their rights under the

7  insurance policy; (2) failing to advise Gary Taladay of his right to Loss of Use benefits under

8  the policy (fair rental value ("FRV") or additional living expenses ("ALE")) and then denying

9  such benefits until the Court ordered payment; (3) adjusting the structure claim with Chase

10 Bank instead of plaintiffs contrary to policy terms; (4) unreasonably denying coverage for

11 necessary repairs to "gut" the first floor of the house due to water damage, rendering the

12 plaintiffs unable to retain a contractor willing to make repairs; (5) concealing a partial

13 inventory list of damaged personal property items generated by MetLife and demanding that

14 plaintiffs create a list of those same items before MetLife would adjust any part of the

15 plaintiffs' insurance claim, including the structure damage and loss of use; and (6) failing to

16 timely pay the structure damage, personal property damage, and loss of use coverage under the

17 policy after MetLife's investigator completed his coverage investigation in September 2014

18 and recommended normal processing and payment of the claim.  MetLife contends that it did

19 not unreasonably deny coverage because plaintiffs failed to mitigate the loss to the first floor of

20 the property as required under the contract, failed to timely submit their receipts for ALE

21 payments, and failed to timely submit a properly completed Proof of Loss form with an

22 inventory of unsalvageable personal property to enable MetLife to adjust the claim.

23

24
     [3] RCW 48.30.015 *et seq.*
     [4] RCW 19.86 *et seq.*

1    The Court has now considered the evidence presented at trial, the exhibits admitted into

2    evidence, the parties' briefs, and the arguments of counsel.  This memorandum opinion will

3    constitute the Court's Findings of Fact and Conclusions of Law.

## II.    LEGAL STANDARDS

### A.  Washington Insurance Fair Conduct Act

6    IFCA provides that "[a]ny first party claimant to a policy of insurance who is

7    unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an

8    action . . . to recover the actual damages sustained, together with the costs of the action,

9    including reasonable attorney's fees and litigation costs...."  RCW 48.30.015(1).  A court

10   "may, after finding that an insurer has acted unreasonably in denying a claim for coverage or

11   payment of benefits or has violated [certain insurance regulations], increase the total award of

12   damages to an amount not to exceed three times the actual damages." RCW 48.30.015(2).  A

13   court "shall, after a finding of unreasonable denial of a claim for coverage or payment of

14   benefits, or after a finding of a violation of a rule in subsection (5) of this section, award

15   reasonable attorney's fees and actual and statutory litigation costs, including expert witness

16   fees, to the first party claimant of an insurance contract who is the prevailing party in such an

17   action."  RCW 48.30.015(3).  Thus, the statute provides a list of violations that give rise to

18   treble damages or to an award of attorney's fees and costs; this list includes violations of

19   Washington Administrative Code ("WAC") provisions 284–30–330, 350, 360, 370, and 380.

20   RCW 48.30.015(5).  However, "an insured cannot base an IFCA claim purely on a violation of

21   Washington's insurance regulations."  *Cedar Grove Composting, Inc. v. Ironshore Specialty*

22   *Ins. Co.*, No. 14-1443-RAJ, 2015 WL 3473465, *6 (W.D. Wash. June 2, 2015).[5]  Rather,

23

24      [5] There is a split in authority between the Western and Eastern Districts of Washington
interpreting IFCA with respect to the issue of whether an insured must show that the insurer

plaintiffs must "allege[] the trigger for an IFCA suit – an unreasonabl[e] deni[al] [of] a claim for coverage or payment of benefits..." *Id.* (quoting RCW 48.30.105(1)).

This Court has recognized that "a refusal to pay a demand for coverage reasonably promptly is an unreasonable denial of benefits, even if only temporary." *Id. See also Freeman v. State Farm Mut. Auto. Ins. Co.*, No. 11-761-RAJ, 2012 WL 2891167, at *3 (W.D. Wash. July 16, 2012) ("For purposes of an insured's extracontractual claim, a failure to pay the amount the insured requests is a denial of coverage. Were it otherwise, an insurer could avoid extracontractual liability merely by conceding coverage, paying its insured one dollar, and refusing to pay any more."). When considering whether the statutory language "denial of payment of benefits" requires an outright refusal by the insurer to pay a specific benefit promised by the policy or whether an unreasonably low payment also triggers the statute, this Court has previously held:

> [A]n insurer cannot escape IFCA simply by accepting a claim and paying or offering to pay an unreasonable amount. The benefits to which the first-party insured is entitled are generally described as payment of the reasonable expenses or losses incurred as a result of an insured event. Where the insurer pays or offers to pay a paltry amount that is not in line with the losses claimed, is not based on a reasoned evaluation of the facts (as known or, in some cases, as would have been known had the insurer adequately investigated the claim), and would not compensate the insured for the loss at issue, the benefits promised in the policy are effectively denied. If, on the other hand, the insurer makes a reasonable payment based on the known facts or is making a good faith effort to appropriately value the loss, the fact that the insured did not

unreasonably denied a claim for coverage or payment of benefits before stating a claim under IFCA, or whether a violation of the enumerated WAC provisions cited in RCW 48.30.015(5) also provide an independent and implied cause of action. *See Langley v. Geico General Insurance Co.*, 89 F.Supp.3d 1083, 1091 (E.D. Wash. 2015) (summarizing caselaw from both districts). This Court follows the law of this district, and finds that "[v]iolations of the regulations enumerated in RCW 48.30.015(5) provide grounds for trebling damages or for an award of attorney's fees; they do not, on their own, provide a cause of action [under IFCA] absent an unreasonable denial of coverage or payment of benefits." *Weinstein & Riley, P.S. v. Westport Ins. Corp.*, No. C08-1694-JLR, 2011 WL 887552, *29 (W.D. Wash. March 14, 2011) (citing RCW 48.30.015(1)). *See also Travelers Indem. Co. v. Bronsink*, No. C08–1524JLR, 2010 WL 148366, at *2 (W.D. Wash. Jan 12, 2010).

immediately get all of the benefits to which it may ultimately be entitled does not establish an "unreasonable denial of payment of benefits."

*Morella v. Safeco Ins. Co. of Illinois*, No. 12-0672-RSL, 2013 WL 1562032, at *3 (W.D. Wash. April 12, 2013). Thus, under IFCA the question is whether MetLife's conduct amounted to an unreasonable denial of a claim for coverage or payment of benefits to which plaintiffs were entitled under the policy.

B.  <u>Washington Consumer Protection Act and Good Faith</u>

Washington's CPA prohibits "[u]nfair methods and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. To prevail in an action under the CPA, plaintiffs must establish that (1) MetLife was engaged in an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) that impacts the public interest, (4) plaintiffs have suffered injury in their business or property, and (5) a causal link exists between the unfair or deceptive act and the injury suffered by plaintiffs. *Panag v. Farmers Ins. Co. of Washington*, 166 Wash.2d 27, 37, 204 P.3d 885 (2009). The first two elements of a CPA action may be satisfied by a legislatively declared per se unfair trade practice. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 791, 719 P.2d 531 (1986). A per se unfair trade practice exists when, by statute, the Legislature declares an unfair or deceptive act in trade or commerce and the statute has been violated.

The Washington Administrative Code provisions governing insurers' conduct operates as such as statute. In other words, a single violation of any one of the WAC regulations governing insurer conduct is an unfair or deceptive act or practice under the CPA. *Anderson v. State Farm Mut. Ins. Co.*, 101 Wash. App. 323, 331, 2 P.3d 1029 (2000) (citing *Industrial*

1  *Indem. Co. v. Kallevig*, 114 Wash.2d 907, 924, 792 P.2d 520 (1990)).[6]  In addition, the public

2  interest element of a CPA claim may be satisfied by a showing that a statute has been violated

3  which contains a specific legislative declaration of public interest impact.  The insurance code

4  begins with such a declaration, acknowledging that "[t]he business of insurance is one affected

5  by the public interest, requiring that all persons be actuated by good faith, abstain from

6  deception, and practice honesty and equity in all insurance matters."  RCW 48.01.030.

7      Thus, the legislature's specific declaration of public interest in insurance matters makes

8  an insurer's violation of the duty of good faith under RCW 48.01.030 a per se violation of the

9  public interest requirement of a CPA claim.  *Hangman Ridge*, 105 Wash.2d at 791.  Similarly,

10  a violation of any one of the regulations set forth in WAC 284-30-300 through 800 constitutes

11  a breach of the insurer's duty of good faith.  *Rizzuti v. Basin Travel Service of Othello, Inc.*,

12  125 Wash. App. 602, 615-16, 105 P.3d 1012 (2005).  Under Washington law, whether an

13

14

15  [6] Relevant to plaintiffs' claims in this case, WAC 284-30-370 requires prompt
investigation of a claim by requiring that "every insurer must complete its investigation of a

16  claim within thirty days after notification of the claim, unless the investigation cannot
reasonably be completed within that time."  This provision does include the caveat that "[a]ll

17  persons involved in the investigation of a claim must provide reasonable assistance to the
insurer in order to facilitate compliance with this provision."  In addition, WAC 284-30-330

18  defines nineteen "specific unfair claims settlement practices."  WAC 284-30-330(1) prohibits
an insurer from "misrepresenting pertinent facts or insurance policy provisions."  WAC 284-

19  30-330(2) prohibits an insurer from "failing to acknowledge and act reasonably promptly upon
communications with respect to claims arising under insurance policies."  WAC 284-30-330(4)

20  prohibits an insurer from "refusing to pay claims without conducting a reasonable
investigation," and WAC 284-30-330(7) prohibits "compelling a first party claimant to initiate

21  or submit to litigation . . . to recover amounts due under an insurance policy by offering
substantially less than the amounts ultimately recovered in such actions or proceedings."  In

22  addition, WAC 284-30-330(6) prohibits "not attempting in good faith to effectuate prompt, fair
and equitable settlements of claims in which liability has become reasonably clear[.]"  Finally,

23  WAC 284-30-330(13) prohibits "failing to promptly provide a reasonable explanation of the
basis in the insurance policy in relation to the facts or applicable law or denial of a claim or for

24  the offer of a compromise settlement."

MEMORANDUM OPINION - 6

1    insurer acted in good faith in administering a claim depends on the reasonableness of its

2    actions. *Gingrich v. Unigard Sec. Ins. Co.*, 57 Wash.App. 424, 433-34, 788 P.2d 1096 (1996).

3                  III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

4              A.  The MetLife Homeowners Insurance Policy and July 24, 2013 Accidental Fire

5              This action concerns a MetLife homeowners insurance policy issued to the now-

6    deceased plaintiff Rosemarie Taladay for her home located at 8702 Lawndale Avenue

7    Southwest in Tacoma, Washington.  In the event of a fire, the homeowner's insurance policy

8    includes coverage for structural damage to Ms. Taladay's home, damaged personal property, as

9    well as "loss of use" benefits for the insured for the length of time it should take to repair the

10   home.  One of Rosemary Taladay's three sons, Gary Taladay, was living with her in the home

11   at the time of the fire and therefore constitutes an "unnamed insured" under the insurance

12   contract and is entitled to all corresponding policy benefits.  Gary's brother Denny Taladay

13   was appointed as the administrator of Ms. Taladay's estate on May 28, 2014.  Ex. 124.  Gary

14   Taladay and Denny Taladay, as the personal representative of Ms. Taladay's estate, are the two

15   plaintiffs in this action.[7]  On December 17, 2015, plaintiffs also exercised their option to have

16   personal property owned by prior guests of the residence, including Denny and their brother

17   Bernard Taladay, covered by their insurance policy.

18             On July 24, 2013, the Taladay residence suffered an accidental fire in an upstairs attic

19   room that had previously been occupied by the third brother, Bernard.  Gary Taladay's

20   voluntary statement to the fire department provides that he had recently replaced a breaker that

---

21             [7] At the time of Ms. Taladay's death in May 2013, two of her three sons, Gary and

22   Bernard Taladay, were living with her in the home.  Shortly after her death and before the fire,
     however, Gary evicted Bernard from the residence.  Bernard Taladay is not a party to this

23   lawsuit, although plaintiffs elected for his damaged personal property to be covered by the
     MetLife policy as a prior guest of the residence.  Although JP Morgan Chase & Co. ("Chase"

24   or "Chase Bank") is identified on the docket as an interested party, Chase has not been
     involved in these proceedings.

MEMORANDUM OPINION - 7

had been malfunctioning for several days.  Gary Taladay was downstairs with a friend at the

time of the fire, and they evacuated the home and called the fire department when they saw

dark smoke in the stairwell.  Ex. 1.  Fire crews promptly responded to the house and

extinguished the fire.  Ex. 2; Ex. 104.

The West Pierce Fire and Rescue Report provides that most of the fire damage was to

the attic bedroom, but water damage from the fire department's efforts to extinguish the fire

and/or smoke damage was present on the first floor as well:

> 1st floor, no fire damage to 1st floor, limited mainly to water damage.  Stairwell leading
> up to 2nd floor had some smoke damage on the walls going up (Pic #12).  Upstairs to
> the right (Pic #14, 15, 16 17) shows heavy heat and smoke damage.  Lots of fire load,
> clothes, furniture, and trash mainly…

> Occupants [sic] mom owned the home but had passed 2 months ago.  Brother used to
> live upstairs but was kicked out of the house and had not lived upstairs for quite a
> while, he last visited about a week ago.  Insurance Company [sic] unknown (page 5).

Ex. 104 at 4.

Although water damage is generally an excluded cause of property loss under the

policy,[8] direct loss that ensues after water damage "caused by fire" is a covered cause of loss:

> *[W]e pay for direct loss that ensues after water damage if caused by fire, theft or*
> *explosion and then we pay only for the ensuing loss.*

Ex. 21 at MET000852 (emphasis added).  Another excluded cause of property loss identified in

the policy that is relevant to the parties' dispute in this case is "[n]eglect by you to use all

reasonable means to save and preserve property at and after the time of a loss, or when

property is endangered by a peril insured against."  Ex. 21 at MET000853.

---

[8] Specifically, the policy exclusions identify "Water damage, meaning any
loss caused by, resulting from, contributed to or aggravated by" flood, tidal water, or
overflow of any body of water, water backed up through sewers or drains, or other water
below the surface of the ground.  Ex. 21 at MET000852.

MEMORANDUM OPINION - 8

1

2

    B.  <u>Plaintiffs Tried Unsuccessfully to Identify the Insurance Company and Reported the Fire to the Mortgagee, JP Morgan Chase</u>

        After the fire, Gary Taladay had difficulty discovering the identity of Ms. Taladay's

3

insurance company, in part because he was neither the named insured nor the administrator of

4

her estate.  He signed two contracts for Emergency Services from Heritage Restoration

5

("Heritage") and 1-800-BoardUp, which are affiliated companies with common ownership.

6

Exs. 105, 107.[9]  Gary Taladay informed Heritage that he did not know the identity of the

7

insurance company, and that he could not afford to pay for mitigation work on his own.

8

        Several employees from Heritage testified that a "contents crew" removed salvageable

9

items from the house the day after the fire and also attempted to help Gary Taladay locate his

10

late mother's fire insurance policy.  Heritage employee Matthew Hollis testified that three to

11

four Heritage employees scoured the house for a couple of weeks trying to find paperwork that

12

would reveal the identity of the insurance company.  Although the Heritage crew did not

13

successfully locate the MetLife policy, Mr. Hollis made several phone calls to Ms. Taladay's

14

prior mortgage companies and insurers on plaintiffs' behalf.  Every company Mr. Hollis

15

contacted advised him that they did not cover the Taladay property and/or did not know the

16

identity of the insurance company that did.  Mr. Hollis' testimony is corroborated by his phone

17

bill, which reflects two calls to the prior mortgagee MetLife Home Loans (not to be confused

18

with defendant MetLife Group Property and Casualty Insurance) and one call to Chase Bank,

19

20

21

22

23

24

       [9] The 1-800–BoardUp contract defined emergency services as "undertak[ing] all work to secure Real Property," and noted that "1-800-BoardUp will not go beyond the general scope of the insurance coverage without approval of Owner."  Ex. 105.  However, if a homeowner cannot afford to pay for emergency board up services to secure the damaged home, 1-800-BoardUp will still perform those services for free.  The Heritage contract defined "emergency services" as "all work required to secure and/or mitigate damage to the Real Property," and again provides that "[Heritage] will not go beyond the general scope of the insurance coverage without written approval from Owner/Insured."  Ex. 107.  As described by one of its longtime employees, the Heritage contract reflected an agreement to repair and restore the property when and if the insurance is located.

MEMORANDUM OPINION - 9

among others. Ex. 167. His testimony is also verified by the Fed. R. Civ. P. 30(b)(6)

representative for Chase Bank, who testified that Chase received a call from Matthew Hollis in

July 2013 reporting a fire at the residence and asking for insurance information, but Mr. Hollis

was told by Chase that he was not authorized on the account to speak on behalf of the

homeowner. Ex. 3; *see also* Ex. 4 (Chase Bank's process notes reflecting Mr. Hollis' inquiry

regarding the steps needed to get the deceased borrower's son authorized). Inexplicably,

Chase Bank failed to report the fire to defendant MetLife or follow up on Mr. Hollis' phone

call in any way. Dkt. 117 at 3 (pretrial order). Gary Taladay also submitted documents to

Chase, including Ms. Taladay's death certificate, in an attempt to have his name added to the

mortgage and become authorized to learn the identity of the insurance company. *Id.*

As the fire rendered the home uninhabitable, Gary Taladay was unable to continue

living in the home after the fire. He began living in an inexpensive motel called the Western

Inn. He was unable to afford both his motel bill and the mortgage, and the mortgage was

placed in default by Chase Bank in April 2014. *Id.* Defendant MetLife first received notice of

the fire from a third party agent of Chase, Dimont & Associates ("Dimont"), on May 30, 2014,

over ten months after the July 24, 2013 loss. Ex. 5 (Dimont's Notice of Claim to MetLife

regarding "Fire causing damage to Dwelling").

C.  The Fire Suppression Efforts Caused Severe Water Damage to the Home

At trial, numerous witnesses testified regarding the severe water damage to the first

floor of the house resulting from the fire department's efforts to extinguish the fire. Battalion

Chief Scott Adams from West Pierce Fire and Rescue testified that at least 250 gallons of

water flowed into the house from the fire hose. Although Chief Adams did not make a lot of

written notes regarding the extent of the water damage he observed, he testified that after a fire

is extinguished upstairs typically water will be dripping from light fixtures. In addition, he

MEMORANDUM OPINION - 10

1    noted that firefighters used tarps to cover furniture in the living room, which they would

2    typically only do to limit the water damage caused by water dripping from the fixtures.

3           When Heritage's lead estimator, Danny Anderton, first entered the home the day after

4    the fire, he observed that although the water had not actually dissolved the drywall, there was

5    water damage everywhere and water was still dripping from the ceilings. He testified that

6    based upon his experience repairing fire-damaged houses for thirty-five years, he was certain

7    there was water in the walls behind the drywall. He opined that the downstairs walls would

8    need to be gutted by stripping the drywall down to the studs due to smoke, water and debris

9    going down into the walls. Mr. Anderton testified that mitigation work, such as bringing in

10   large fans to attempt to dry out the house, would not have saved the downstairs drywall.[10]

11   Because the downstairs required gutting, Heritage did not bring in large fans or other drying

12   equipment.

13          Kevin Godfrey, the owner of Heritage and 1-800-BoardUp, also entered the home the

14   first or second day after the fire. He testified that there was water damage throughout the

15   house, and the downstairs carpet was soaked, some of the light fixtures were filled up with

16   water, and water was dripping through various parts of the ceiling. Due to the extent of the

17   dripping water, Mr. Godfrey returned to his car to put on taller boots and grab a rain shed

18   jacket. He also opined that the entire house, including the first floor, needed to be gutted

19   because the water damage was so severe the drywall on the first floor could not be saved. He

20   testified that 1-800-BoardUp did some work securing the home the day of the fire, as well as

21   packing out some contents. However, Heritage did not perform what he considers mitigation

22   _____

23          [10] Mr. Anderton also testified that Heritage does not bring in drying equipment and fans
     unless a contract is signed and Heritage knows who the insurance company is, and in this case
     Gary Taladay did not know the identity of the insurance company and could not afford to pay
24   for mitigation work on his own.

MEMORANDUM OPINION - 11

1    work, i.e. run fans or equipment,  because running equipment was  not practical in light of the

2    water in the walls, ceiling, first floor ceiling joists, and other cavities.

3         Restoration estimator Tom Gibbons from Tersuli Construction was retained by MetLife

4    to estimate the cost of repairing the fire damage to the Taladays' home.  His first estimate for

5    the cost of repairs, prepared in July 2015, also included gutting the entire house.  He testified

6    that the first floor of the house had a lot of delamination, such as cracking and peeling of

7    panels, likely related to water damage and water sitting in the walls.  He also testified that

8    smoke could have gotten into the walls through the ductwork.  Mr. Gibbons testified that it is

9    hard to say whether mitigation work would have saved anything, and he would not disagree if

10   another restoration contractor, who visited the site within a few days of the fire, concluded that

11   gutting the entire house was necessary.[11]  Finally, Mr. Gibbons acknowledged that his original

12   estimate of both the cost and scope of repairs for the house were quite close to Mr. Anderton's

13   estimate for Heritage, and both estimates involved gutting the entire house.  *Compare* Ex. 70

14   (Mr. Anderton's $130,086 estimate for repairs) with Ex. 81 (Mr. Gibbons' $122,528 original

15   estimate for repairs).

16        Finally, the MetLife adjustor who managed the majority of plaintiffs' claim, Tim

17   Berglund, initially testified that he did not believe that the Taladays should have done anything

18   more to mitigate the damage to the home after the fire.  He testified that he did not have "any

19   criticism" of what the Taladays did to protect the property from further damage after the fire,

20   or of their decision to retain Heritage for assistance after the fire.  Mr. Berglund did not

21

22        [11] When Mr. Gibbons was recalled to testify during MetLife's case, Mr. Gibbons
23   retreated from his prior testimony.  However, the Court does not find Mr. Gibbons' subsequent
     testimony fully credible, especially in light of his trial demeanor and his acknowledgment that
24   MetLife is a frequent client.  His initial testimony on direct examination appeared direct and
     forthright.

MEMORANDUM OPINION - 12

1    personally inspect the property until it had been sitting vacant for nearly a year, and he

2    commented that it was "a little hard to be critical of" the Taladays at that point in time.

3         Thus, there was substantial – and consistent – evidence at trial supporting plaintiffs'

4    claim that the first floor of the house suffered severe water damage after the fire.  Significantly,

5    the testimony of Chief Adams, Mr. Anderton, and Mr. Gibbons all indicate that the water

6    damage directly resulted from the fire suppression efforts, because water used to extinguish the

7    fire in the attic was dripping from light fixtures in the ceiling and likely running into the walls.

8    Because the water damage to the first floor of the home constituted "direct loss that ensues

9    after water damage . . . caused by fire," it was a covered cause of loss under the policy.  Ex. 21

10   at MET000852.

11        Witnesses from Heritage, and even initially MetLife's adjustor Tim Berglund, also

12   agreed that mitigation work such as bringing in large fans or other drying equipment would not

13   have improved the condition of the first floor of the home to such an extent as to prevent it

14   from needing to be gutted.  Indeed, MetLife's adjustor had "no criticism" of the plaintiffs'

15   mitigation efforts.  Accordingly, the Taladays did not breach their contractual obligation to

16   mitigate the loss after the fire by failing "to use all reasonable means to save and preserve

17   property at and after the time of a loss, or when property is endangered by a peril insured

18   against."  Ex. 21 at MET000853.  MetLife's mitigation defense is not supported by the

19   evidence at trial.

20        D.   MetLife Unreasonably Failed to Advise Plaintiffs that its Initial Coverage
             Investigation Concluded by September 2014, and Forced Plaintiffs to File this
21           Action to Preserve Their Rights Under the Policy

22        After MetLife received notice of the fire on May 30, 2014 from Dimont, the first

23   MetLife adjustor assigned to the Taladays' claim, Seth Alexander, spoke with Heritage's

24   Kevin Godfrey by telephone on June 3, 2014 and inspected the house on June 5, 2014.

MEMORANDUM OPINION - 13

1  Dkt. 117 at 4.  He also sent plaintiffs a June 4, 2014 letter acknowledging receipt of their

2  claim and identifying their policy limits, as well as a Reservation of Rights Letter.  Exs.

3  6-7.[12]  The Reservation of Rights letter provided that "We need to inform you about a

4  potential coverage problem for your recent claim with us," and cited plaintiffs' (1) failure

5  to immediately report the loss and (2) failure to make reasonable and necessary repairs to

6  protect the house from further damage as reasons why MetLife may not have any

7  obligation to provide coverage under the policy.  Ex. 6.  MetLife then reassigned the

8  claim from Mr. Alexander to Mr. Berglund, who inspected the house on June 9 and 10,

9  2014. *Id.* at 5.[13]

10  MetLife assigned Special Investigations Unit ("SIU") Investigator James Lindsay to

11  investigate the reasons for the Taladays' late reporting of the fire.  In addition, MetLife asked

12  Mr. Lindsay to provide clarification as to the role and involvement of each of the Taladay

13  brothers in the claim.  Mr. Lindsay testified that he was not asked to investigate whether

14  plaintiffs failed to mitigate the loss to the property by protecting it from further damage.  SIU

15  investigations are typically completed within thirty (30) days, if it is possible.

16  As part of his investigation, Mr. Lindsay met with Denny and Gary Taladay at the

17  house on June 26, 2014. Ex. 97 at 25.  As Mr. Lindsay had not yet learned that Gary Taladay

18  was living in the home at the time of the fire, Mr. Lindsay advised Gary Taladay that he was

19  unlikely to be reimbursed for his cost of living in a motel or other alternative living expenses

20  ("ALE") because he was not a named insured on the policy.  Although Mr. Lindsay asserts that

21

22  [12] Relevant to this case, the first letter listed a "summary of your policy coverage" as
    follows: Dwelling $134,484, Private structures $26,897, Contents $94,139, and Loss of use
23  $33,621.
    [13] Mr. Berglund also sent Dimont a Reservation of Rights letter on June 10, 2014. *Id.*
24  On July 11, 2014, Mr. Berglund sent Denny Taladay a letter with blank Proof of Loss forms
    with a request that he return the completed form within sixty (60) days. *Id.*

MEMORANDUM OPINION - 14

1    he did not make a definitive statement about coverage, he also told plaintiffs that their late

2    reporting of the loss can affect whether their claim is covered.  Mr. Lindsay also refused to

3    speak with Mr. Anderton, the Taladays' contractor from Heritage, because he felt that Mr.

4    Anderton was not entitled to have information about the policy as Mr. Anderton was not

5    involved in the claim.  Gary and Denny Taladay both testified that Mr. Lindsay told them

6    during their meeting at the house that their claim was likely not covered due to the late

7    reporting, and that MetLife would not reimburse Gary Taladay's ALE.

8           Meanwhile, MetLife had an obligation under WAC 284-30-380(5) to send plaintiffs

9    written notice of the approaching one-year lawsuit deadline.  Such written notice should have

10   been sent directly to the Taladays thirty (30) days before the deadline passed – or no later than

11   June 24, 2014 - because they had not yet retained legal counsel.[14] Mr. Berglund conceded at

12   trial that no such notice was sent to the Taladays in this case.  Once plaintiffs' counsel had

13   been retained, he wrote to Mr. Lindsay on July 11, 2014, pointing out that the July 24, 2013

14   one-year suit limitation in the insurance policy was fast approaching, and asking for an

15   extension of the deadline to file a lawsuit while MetLife continued its coverage investigation.

16   Ex. 133.  After receiving no response from Mr. Lindsay, plaintiffs' counsel then spoke to Mr.

17   Berglund's claim supervisor, Dan Reist, on July 15, 2014, and repeated his request.  Mr. Reist

18   denied plaintiffs' request for an extension, although MetLife routinely grants such extensions

19   of the suit limitation period where coverage investigations are ongoing or claims are still being

20   adjusted.  Plaintiffs' counsel then advised MetLife in writing that plaintiffs "will have no

21

22          [14] Specifically, WAC 284-30-380(5) provides that "[i]nsurers must not continue
23   negotiations for settlement of a claim directly with a claimant who is neither an attorney nor
     represented by an attorney . . . without giving the claimant written notice that the time limit
24   may be expiring and may affect the claimant's rights. This notice must be given to first party
     claimants thirty days . . . before the date on which any time limit may expire."

MEMORANDUM OPINION - 15

1    choice but to file a lawsuit to preserve their rights." Ex. 134.  Plaintiffs then filed their

2    complaint in King County Superior Court on July 17, 2014.  Ex. 135.[15]

3            On September 11, 2014, Mr. Lindsay concluded his investigation.  He wrote in

4    MetLife's claim notes that "this investigation is now complete. Based on the facts and

5    circumstances developed during this investigation, I am recommending a routine handling of

6    the claim." Ex. 28.   However, the fact that Mr. Lindsay had concluded that plaintiffs' claim

7    should be covered under the policy was never shared with the Taladays, who believed that

8    MetLife's coverage investigation was still ongoing.  Even when plaintiffs' counsel asked for a

9    status update regarding the coverage investigation, Mr. Berglund failed to appraise him that

10   MetLife would adjust the claim as a covered loss.

11           On September 26, 2014, plaintiffs' counsel asked Mr. Berglund "if there is anything

12   more you need from the Taladays" and for an update regarding "the status of your

13   investigation and when you expect to make a decision." Ex. 29.  Instead of taking that

14   opportunity to advise plaintiffs that MetLife would adjust the claim as a covered loss, Mr.

15   Berglund simply requested "a properly completed proof of loss, which includes a completed

16   content inventory list." Ex. 30.  Although this request by MetLife, without more, was

17   reasonable, Mr. Berglund took the unreasonable position that MetLife's adjustment of the

18   structure loss (and apparently all aspects of the claim) would be contingent upon plaintiffs

19   preparing an inventory of lost personal property without knowing whether any aspect of their

20   claim would be covered by MetLife.

21           Plaintiffs' counsel responded to Mr. Berglund that his clients were unable to afford to

22   hire a professional inventory company to list and appraise all the damaged items until they

23   

24   [15] On August 20, 2014, MetLife removed the matter to this Court.  Dkt. 1.  On April 29,
2015, plaintiffs filed the instant Amended Complaint.  Dkt. 29, Ex. 1 at 3-4.

MEMORANDUM OPINION - 16

1    knew whether MetLife was going to treat this as a covered loss.  Ex. 30.  On October 14, 2014,

2    Mr. Berglund told plaintiffs' counsel that "MetLife's investigation of this loss is continuing.

3    Our coverage determination will be based upon a full and complete investigation of the claim,

4    which includes our review of your client's inventory of damaged or destroyed items."  Ex. 32.

5         On December 4, 2014, plaintiffs' counsel sought clarification of Mr. Berglund's letter

6    with respect to coverage for the structure damage to the Taladay residence, pointing out that

7    "Mr. Berglund's October 14 letter appears to state that MetLife will not make a coverage

8    decision concerning *the structure damage* and personal property until after my clients provide

9    a list of the hundreds of damaged items in the house.  This makes no sense to me.  How does

10   the contents list have any bearing on MetLife's decision on whether there is coverage for the

11   fire damage?"  Ex. 33.[16]  When plaintiffs' counsel received no response to his letter from

12   MetLife, he asked MetLife again to explain its coverage position.  Ex. 34.

13         When defense counsel finally responded to plaintiffs' letter on MetLife's behalf on

14   December 19, 2014, he advised plaintiffs *for the first time* that MetLife was adjusting the claim

15   as a covered loss, stating that "MetLife continues to adjust this claim as a covered loss.

16   However, the continued *adjustment of your client's claim is contingent upon your client's*

17   *willingness to present an inventory of lost or damaged items*."  Ex. 35 (emphasis added).[17]

18   Similarly, contrary to the testimony of Mr. Berglund's supervisor, Dan Reist, that MetLife

19   "never had a question whether we were covering the claim," MetLife's response to plaintiffs'

20

21        [16] Plaintiffs' counsel then asked if MetLife would agree to pay for the cost of a
professional to assist with the preparation of the inventory list, as plaintiffs could not afford to
22   hire such a professional if MetLife decided not to pay them for the damaged items.
       [17] MetLife also denied plaintiffs' request that MetLife agree to pay the cost of hiring a
23   professional to prepare an inventory of lost or damaged items, as this is not a supplemental
coverage under their policy.  The Court is not aware of any authority, and plaintiffs have cited
24   none, holding that MetLife's refusal to pay for a professional to inventory plaintiffs' personal
property was unlawful.

MEMORANDUM OPINION - 17

1   first interrogatories as late as December 22, 2014 provided that "no coverage determination has

2   been made at this time." Ex. 36.  On January 12, 2015, plaintiffs filed a Insurance Fair

3   Conduct Act Notification with the Office of the Insurance Commissioner, giving MetLife

4   notice that plaintiffs believed their rights under IFCA had been violated by MetLife's conduct

5   by "fail[ing] to pay any money for the damage to the Taladays' house, the items damaged by

6   the house fire, or the cost of living in a motel." Ex. 37.

7   　　　As noted above, WAC 284-30-330 defines nineteen "specific unfair claims settlement

8   practices."  Relevant to MetLife's conduct at the outset of this action, WAC 284-30-330(1)

9   prohibits an insurer from "misrepresenting pertinent facts or insurance policy provisions."

10   MetLife misrepresented the fact that MetLife's initial coverage investigation was ongoing

11   when it fact it was apparently completed by September 11, 2014, within thirty days of when

12   Mr. Lindsay began his investigation.[18]  If plaintiffs were advised of this fact, they could have

13   felt confident that large expenditures (such as the cost of hiring a professional to assist them in

14   inventorying the unsalvageable contents of the home) were necessary and justified to present

15   their claim.  Plaintiffs testified that in the months following the fire, they were both

16   unemployed and any fees incurred hiring a professional to assist them in presenting their claim

17   would be an extreme financial hardship.  The knowledge that MetLife would ultimately

18   reimburse them for covered personal property would have assisted them a great deal in

19   promptly presenting their claim for damaged personal property.

20

21   　　　[18] Indeed, the Court's March 25, 2015 Order granting plaintiffs' motion for partial

22   summary judgment on the narrow issue of whether the accidental fire was a covered cause of
     loss under the MetLife contract observed, in part, that "[a]lthough MetLife argues that its

23   investigation of the insurance claim is not yet complete, MetLife has not identified any specific
     evidence that it is seeking that would establish a sufficient basis for denying coverage.  Nor has

24   MetLife presented any authority for the proposition that this Court should delay ruling until
     after MetLife decides that its claim investigation is complete." Dkt. 28 at 4.

1      In addition, MetLife repeatedly misrepresented to the plaintiffs that the adjustment of

2   their entire claim, including structure damage and ALE, was contingent upon presentation of a

3   complete inventory of damaged personal property.  However, substantial evidence at trial,

4   including the testimony of Mr. Berglund, established that this was not the case.  Numerous

5   witnesses from MetLife conceded that MetLife was able to adjust the structure portion of the

6   claim and ALE regardless of whether the company had received an inventory of damaged

7   personal property.  Similarly, Mr. Berglund testified that MetLife did not need a fully

8   completed Proof of Loss form from the Taladays in order to adjust the structure claim.

9      WAC 284-30-330(7) prohibits "compelling a first party claimant to initiate or submit to

10   litigation . . . to recover amounts due under an insurance policy by offering substantially less

11   than the amounts ultimately recovered in such actions or proceedings."  No money was offered

12   to the Taladays, in the form of ALE or otherwise, prior to the lawsuit deadline.  This may have

13   been understandable in light of the fact that the one-year lawsuit deadline followed closely on

14   the heels of the time when MetLife first received notice of the claim.  It is troubling, however,

15   in light of the fact that an extension of time was requested to avoid filing a lawsuit, and that

16   MetLife often grants such requested extensions.  Mr. Berglund's manager, Dan Reist, testified

17   that claims involving fire damaged houses frequently last more than twelve (12) months and

18   depending upon where MetLife is in the adjustment process, the company will grant extensions

19   of the one-year deadline.  Mr. Reist testified that MetLife "never had a question whether we

20   were covering the claim," despite MetLife's representations to the contrary.  Mr. Berglund also

21   testified that MetLife "always" assumed that plaintiffs' claim was covered.  Nevertheless,

22   MetLife misrepresented critical facts about coverage and the status of its investigation, and

23   refused to extend the one-year suit limitation period.  As a result, MetLife violated WAC 284-

24   30-330(7) by compelling plaintiffs to initiate

MEMORANDUM OPINION - 19

1   this action to recover amounts due under the policy.

2        Finally, as discussed above, MetLife violated WAC 284-30-380(5) by failing to send

3   plaintiffs advanced written notice of the approaching one-year lawsuit deadline.  MetLife's

4   witnesses conceded that the failure to do so violated the insurance regulations.

5        E.   <u>MetLife Adjusted the Structure Claim with Chase Bank and Excluded Plaintiffs</u>

6        The insurance policy includes a Lender's Loss Payable endorsement, which is a

7   Washington addendum to the insurance contract, that provides: "Loss or damage, if any, under

8   this policy shall be payable first to the loss payee or mortgagee . . . and, second, to the insured,

9   as their interests may appear. . ." Ex. 21 at MET000882.  However, the policy, at H-1, also

10   provides: "Our Settlement Options: **We** will adjust all losses with **you**." Ex. 21 at MET000859

11   (emphasis in original).

12        On May 30, 2014, mortgagee Chase Bank's agent, Dimont & Associates, first filed a

13   Notice of Claim with MetLife regarding the fire damage at the Taladays' property.  Ex. 5.

14   After MetLife acknowledged receipt of Chase's claim, Dimont advised MetLife on June 9,

15   2014 that the home was involved in foreclosure proceedings.  Ex. 8.[19]  That letter also directed

16   MetLife to direct "all correspondence . . . to this office and to the attention of Anna Guenther.

17   Any and all payments should be made in the name of 'Dimont & Associates in trust for JP

18   Morgan Chase N.A. (FHA) ISAOA ATIMA for the account of ESTATE OF ROSEMARIE K.

19   TALADAY[.]'" Ex. 8.

20        A few days after Mr. Berglund had taken over as adjustor of plaintiffs' claim on June 6,

21   2014, he noted in his claim notes on June 10, 2014 that he "spoke with Anna Guenther, with

22

---

23       [19] Specifically, Dimont warned MetLife "that this property may sell to a third-party and
[be] made unavailable at any time.  As such, [MetLife] may lose its opportunity to inspect,

24   which may have a serious affect on [MetLife's] ability to accurately compensate our client for
the loss it has suffered under the policy of insurance." Ex. 8.

MEMORANDUM OPINION - 20

1    Dimont and Associates today.  Anne (sic) informed me the home went into default as of April

2    2014.  Their records show an attempt to have a son added to the account as early as 7/29/13."

3    Ex. 9.  He further noted that "Chase Bank received the notice of death certificate on 9/11/13.  It

4    was not until 6/2/14, did they note authorization to speak with the executive of the estate.  The

5    outstanding loan balance is $86,987.65."  Ex. 9.  Mr. Berglund then sent Dimont a Reservation

6    of Rights letter, nearly identical to the one sent to plaintiffs, and also requested substantial

7    documentation related to the claim.  Ex. 10.

8           On June 20, 2014, Dimont responded to MetLife's June 10, 2014 Reservation of Rights

9    letter and request for documentation, stating that "as we advised, due to the family's active

10   involvement in this claim, the mortgage company has been alerted and *will monitor internally*

11   *until MetLife determines coverage for the named insured*.  Chase's interests under the policy

12   should still be held if any payments were issued to the named insured family, and if denial is

13   issued to the family, Chase would then be able to reestablish direct contact with MetLife to

14   resolve claim."  Ex. 15 (emphasis added).  Dimont then reiterated, "If MetLife has denied

15   coverage to the named insured family please advise, *otherwise Chase will monitor internally*

16   *for conclusion and resolution of claim via the claim the family presented*."  Ex. 15 (emphasis

17   added).

18          Despite Dimont's directive that MetLife should complete its adjustment of the claim

19   "via the claim the family presented," MetLife proceeded to adjust the structure claim directly

20   with Chase Bank, excluding plaintiffs and their attorney from the process entirely.  As noted

21   above, MetLife's contemporaneous communications with plaintiffs' counsel had indicated that

22   adjustment of the structure claim was contingent upon plaintiffs' submission of an inventory of

23   damaged personal property.  Exs. 30, 32, 33, 34, 35.  On the same day that plaintiffs filed their

24   first motion for summary judgment asking the Court to confirm that the fire was a covered

MEMORANDUM OPINION - 21

1    cause of loss under the policy, Dkt. 14, MetLife contacted Chase Bank's representatives in an

2    effort to calculate an actual cash value payment for the structure worth less than half of

3    plaintiffs' coverage amount for the dwelling under the policy.  Specifically, on February 19,

4    2015, defense counsel contacted Dimont "about the status of Chase's interest in the property."

5    Ex. 42.[20]  Mr. Berglund, as well as MetLife representative James Nickle, testified that

6    MetLife's delayed payment for the structure damage was caused by Chase being less than

7    forthcoming with the payoff information.  This, however, was not true.  Contrary to Mr.

8    Nickle's testimony, MetLife received the payoff quote from Dimont on March 3, 2015.  Ex. 46

9    (email to Mr. Berglund with "the payoff you requested"); *see also* Ex. 157 (payoff quote

10   generated Tuesday, March 3, 2015 for $89,526.56).  On March 4, 2015, Dimont also sent

11   defense counsel payment instructions.  Ex. 47.[21]  Plaintiffs were not apprised of any of these

12   communications, even when plaintiffs' counsel specifically asked MetLife to include the

13   Taladays as payees on the check.

14           On April 1, 2015, counsel for MetLife wrote to plaintiff's counsel, stating: "You stated

15   to the court that should the court rule in your favor, your clients could then afford to hire

16   Heritage Restoration *to evaluate the damage to the home* and create an inventory of personal

17   property."  Ex. 57 (emphasis added).  Plaintiff's counsel promptly responded that Heritage "is

18   starting the process of evaluating the *cost of repairing the structure damage* and generating an

19           [20]A few days later, defense counsel asked plaintiffs' counsel to withdraw their pending
20   motion for partial summary judgment because "MetLife has never disputed that this loss was
     caused by fire, or that the accidental fire is a covered peril under the policy" and suggesting
21   that the plaintiffs "continue to refuse to cooperate under the terms and conditions of the
     policy."  Ex. 43.  However, when plaintiffs' counsel asked if MetLife's concession that the
22   accidental fire damage was covered "mean[s] that MetLife has now agrees to pay for the fire
     damage and the cost of Gary Taladay staying at a motel," Ex. 44, his question went
23   unanswered by MetLife.  The Court granted plaintiffs' motion on March 25, 2015.  Dkt. 28.
             [21] Several emails from Dimont to defense counsel followed, asking whether MetLife
24   had received the payoff amount and payment for the structure had been mailed to Dimont yet.
     Exs. 48, 53.

MEMORANDUM OPINION - 22

inventory of the contents damage.  We will provide you with their estimate once we receive

them (sic)."  Ex. 58.  In addition, counsel stated that "I understand MetLife believes the

insurance contract allows it to adjust the structure loss with Chase without including the

Taladays as payee.  I believe this is contrary to Washington law.  Please be advised that the

Estate of Rosemary Taladay should be included as a payee on all checks issued for the

structure….If you disagree with our position concerning the loss payee, please let me know so

that we can seek resolution of this issue."  Ex. 58.  However, MetLife did not respond to this

email and instead continued to adjust the structure loss directly with Dimont.

The day after Mr. Berglund received an April 16, 2015 email from Dimont asking

whether Dimont was going to be receiving a check, Mr. Berglund sent Dimont a cover letter, a

copy of an estimate for the structure damage, and a check for the sum of $51,050.82 as the

actual cash value for the structure loss.  Ex. 59 (April 16, 2016 email from Dimont to

Berglund); Ex. 61 (check for $51,050.82).[22]  Mr. Berglund did not advise plaintiffs that

MetLife had made payment to Dimont for the structure damage, although that payment was to

be held in trust for plaintiffs to make repairs to the property.

On April 29, 2015, plaintiffs' counsel wrote to defense counsel asking for a response to

his April 2, 2015 letter regarding adjusting the loss with the bank without involving the

Taladays, and advising MetLife that plaintiffs feel they have "no choice but to seek assistance

---

[22] Mr. Berglund's cover letter asserted that if the property was repaired, and if the bank
retained an insurable interest in the property, then MetLife would send up to an additional
$9,860.79, representing the actual cost to repair or replace the damaged property.  Ex. 60.  The
letter also directed Dimont to "provide a copy of this estimate to the contractor of your choice.
If the contractor should find this estimate insufficient, please send us your contractor's detailed
estimate for our review and approval of any supplement prior to the beginning of repairs."  Ex.
60.

MEMORANDUM OPINION - 23

1    from the Court." Ex. 62.[23]  Only in response to that letter did defense counsel advise

2    plaintiffs' counsel for the first time that MetLife had already issued the $51,050.82 payment to

3    Chase Bank. Ex. 64 (defense counsel's April 29, 2015 email); *see also* Ex. 65 (plaintiffs'

4    counsel responding that the check to Chase Bank should have included the Taladays' estate as

5    a payee, and defense counsel confirming that it did not).

6         Plaintiffs' counsel e-mailed Mr. Berglund and defense counsel on May 28, 2015, and

7    attached Heritage estimator Danny Anderton's $130,086 estimate for the cost of repairing the

8    house. Ex. 69, 70.[24]  Plaintiffs' counsel asked if MetLife "will authorize the Taladays and/or

9    Chase to repair the house using the amount estimated in Mr. Anderton's estimates. Also, please

10   let me know if MetLife will revise its ACV payment and base it on Mr. Anderton's estimates."

11   Ex. 69. Plaintiffs' counsel also reminded MetLife that the foreclosure sale is set for June 26,

12   2015, and therefore "if MetLife disputes Mr. Anderton's estimates, we need to move quickly to

13   resolve any dispute." Ex. 69.

14        Tersuli Construction Services estimator Tom Gibbons was then retained by MetLife to

15   prepare an estimate of the cost of repairing the fire damage to the home in June or July 2015.

16   His original estimate included "gutting" the entire house, and totaled $122,528.48. Ex. 81 at

17

18

19

---

20   [23] Plaintiffs previously submitted evidence in this case showing that plaintiff followed
     up his April 2, 2015 letter to MetLife with several emails, which all went unanswered by

21   MetLife, requesting a response and asking if MetLife was going to pay the bills that had been
     provided. These communications, however, are not trial exhibits.

22   [24] Mr. Anderton provided three estimates which include pricing for July 2013, July
     2014, and "today's pricing April 2015." Ex. 69. Mr. Hanson promptly forwarded Mr.

23   Anderton's email with attachments to MetLife. Although Mr. Anderton's estimate is dated
     July 24, 2013, Mr. Anderton testified that this date was an error and he likely started to prepare

24   the estimates earlier in May 2015 and completed them on May 28, 2015, shortly before
     sending them to plaintiffs' counsel.

MEMORANDUM OPINION - 24

26-27.[25] Mr. Gibbons testified that he prepared his estimate in the same way as he would for

any ordinary fire insurance claim, by including all damage that appeared related to the fire.

Upon receipt of Mr. Gibbons' estimate, which plaintiffs' counsel observed was very

close to Mr. Anderton's $130,086 estimate, plaintiffs asked MetLife to "please calculate the

actual cash value (ACV) for the cost of repairs based on that estimate and reissue payment to

the Taladays accordingly.  Please also confirm that the Taladays are authorized by MetLife to

spend up to $122,528 for the cost of repairs . . . If MetLife does not agree to these requests,

please explain why." Ex. 82. Mr. Berglund did not respond to plaintiffs' letter, although he

conceded that he should have done so under Washington law.  He further conceded that he did

not communicate with the Taladays at all concerning the structure claim, because MetLife was

strictly trying to communicate with the lender about the damages and "the amount that we

were trying to pay."[26]  Although Mr. Berglund acknowledged that the insurance contract

required MetLife to adjust the structure claim with the Taladays, he and Mr. Reist testified that

they thought this case was unique due to the fact that the house was in pre-foreclosure.

As Mr. Berglund conceded at trial, MetLife's exclusive adjustment of the structure

portion of the claim with Chase Bank violated the insurance contract, which required MetLife

to "adjust all losses with [the insured]." Ex. 21 at MET000859.  The fact that Chase Bank, as

mortgagee, was entitled to receipt of the insurance proceeds up the mortgage payoff amount

under the Lender's Loss Payable endorsement did not justify MetLife's decision to exclude

---

[25] Mr. Gibbons' estimate was apparently not provided to plaintiffs' counsel by MetLife until July 9, 2015. Ex. 82. Although the estimate contains different dates, Mr. Gibbons testified that it was completed around July 1, 2015.

[26] Similarly, Mr. Berglund's supervisor Dan Reist testified that MetLife was adjusting the claim with Chase Bank.

MEMORANDUM OPINION - 25

1  plaintiffs entirely from the process.[27]  Indeed, by doing so, MetLife rendered plaintiffs largely

2  unable to protect their interest in making repairs to the home – which is their right under the

3  contract.  MetLife's behavior also suggested a keen awareness, on its part, that it would be far

4  less expensive for MetLife to negotiate a low actual cash value payment to Chase Bank, rather

5  than involve the plaintiffs and increase the likelihood that MetLife would need to pay for the

6  full cost of repairs.[28]

7       MetLife's failure to communicate with the Taladays regarding the structure claim,

8  despite repeated inquiries from plaintiffs' counsel regarding coverage, also violated WAC 284-

9  30-360(3).  That provision provides that it is an unfair act for an insurer to fail to provide "an

10  appropriate reply . . . within ten working days" to "all other pertinent communications from a

11  claimant reasonably suggesting that a response is expected[.]"  Mr. Berglund violated this

12  provision on numerous occasions with respect to plaintiffs' inquiries regarding the structure

13  claim, such as his failure to respond to plaintiffs' counsel's inquiries regarding whether

14  MetLife would authorize payment based upon repair estimates generated by Mr. Anderton or

15  Mr. Gibbons.

16       F.   MetLife Unreasonably Modified Mr. Gibbons' Estimate By Excluding Repairs
            Related to "Gutting" the First Floor of the House

17       Mr. Berglund initially testified that he did not "deny coverage" for the water damage

18  that had occurred to the first floor of the house.  Rather, he reduced Mr. Gibbons' original

19  $122,528 estimate to $75,719 because the Taladays' insurance policy did not afford coverage

20

21       [27] The Court finds that this conduct also violated WAC 284-30-330(13), which
    provides that it is an unfair act for an insurer to "fail[] to promptly provide a reasonable
22  explanation of the basis in the insurance policy in relation to the facts or applicable law for
    denial of a claim or the offer of a compromise settlement."
23       [28] MetLife's $52,000 actual cash value payment to Chase bank was substantially less
    than the $122,000-$130,000 estimates for repairs that MetLife received from the two
24  estimators who evaluated the fire damage.

1   for "code upgrades." *Compare* Ex. 81 (Mr. Gibbons' original $122,528 estimate) *with* Ex. 184

2   (Mr. Gibbons' final $75,719 estimate).  This explanation was not credible, as both Mr.

3   Anderton and Mr. Gibbons testified that code upgrades would have likely cost around $5,000.

4   Thus, the fact that the Taladays' policy did not afford approximately $5,000 in code upgrade

5   coverage does not account for the nearly $50,000 reduction Mr. Berglund made to Mr.

6   Gibbons' estimate.  Mr. Gibbons testified that Mr. Berglund directed him to make specific

7   changes to the estimate based upon "his [Mr. Berglund's] opinion," even though both

8   contractors who provided Mr. Berglund with estimates for repairs (Mr. Anderton and Mr.

9   Gibbons) recommended gutting the first floor of the house.

10      Mr. Berglund subsequently testified that he modified Mr. Gibbons' estimate to remove

11   any repairs related to "mold damage" because he believed any mold was subject to a $1,000

12   policy limit, if it resulted from a covered cause of loss at all.  He did not believe the mold

13   directly resulted from the fire suppression efforts, but instead resulted from the home being

14   vacant and without climate control for so long.  Thus, he stated that either MetLife would pay

15   for the mold and apply the $1,000 policy limit, or MetLife would not pay for any mold damage

16   because it was not directly caused by the fire.[29]  Mr. Berglund conceded that any water damage

17   directly resulting from the fire suppression efforts is covered under the policy, but stated the

18   mold in the home "indirectly" resulted from the fire in this case.

19      The Court finds Mr. Berglund acted unreasonably by modifying Mr. Gibbons' estimate

20   to remove repairs related to gutting the first floor of the house.  Mr. Berglund's suggestion that

21   his changes to the original estimate simply reflected "mold damage" or "code upgrades" that

22

---

23      [29] Mr. Berglund did not advise the Taladays that they could make a secondary claim for
     the additional mold damage to the house because he did not believe the mold resulted from a
24   covered cause of loss, and in any event, Mr. Berglund stated that he was not at the house to
     "investigate" the cause of the mold – only the fire.

MEMORANDUM OPINION - 27

1    were not afforded by the policy is not credible.  As discussed above, there is substantial

2    evidence that the first floor of the home suffered severe water damage as a result of the fire

3    suppression efforts.  Numerous witnesses, including the two experienced contractors who

4    prepared the estimates for repairs, testified that the first floor of the home needed to be

5    "gutted" due to the severe water damage that resulted from the fire.  As Mr. Berglund testified,

6    water damage resulting from the fire suppression efforts is covered under the policy.  Mold and

7    code upgrades do not account for the drastic changes Mr. Berglund made to Mr. Gibbons'

8    original estimate.

9         Mr. Berglund's unreasonable adjustment of the estimate for repairs had catastrophic

10   consequences for the Taladays in this case, because by greatly reducing the funds available for

11   the Taladays to make necessary repairs to the structure, MetLife made it impossible for

12   plaintiffs to find a contractor willing to complete the work.  For example, Mr. Gibbons testified

13   that if he cannot reach an agreement with an insurance company regarding the cost of

14   necessary repairs and the homeowner cannot afford to pay on their own, he declines to

15   undertake repairs on a fire-damaged property.  Meanwhile, if no repairs are actually made to a

16   property, MetLife is able to pay much less under the contract than they are obligated to pay if

17   the home is repaired.  Specifically, MetLife is only obligated to pay actual cash value (a

18   depreciated amount) for the structure until repairs are actually untaken.  Thus, although the

19   $52,000 structure payment MetLife made to Chase Bank was being held in trust for the

20   Taladays to make repairs to the property, it was an insufficient amount of money to make the

21   necessary repairs to make the home habitable. Because plaintiffs were unable to afford repairs

22   to the home, in the absence of sufficient insurance proceeds, the home was foreclosed upon by

23   Chase Bank and sold at a Trustee's foreclosure sale on February 10, 2016 for $76,200.  Ex.

24

MEMORANDUM OPINION - 28

1    99.[30]

2         As discussed above, MetLife argues that Mr. Berglund's actions were justified because

3    plaintiffs violated the policy provision requiring them to protect the home against further

4    damage after the fire.  An insurance company asserting an affirmative defense bears the burden

5    of proving the facts necessary to establish it, and failure to mitigate damage is an affirmative

6    defense in the insurance context.  *See Kanne v. Conn. General Life Ins. Co.*, 867 F.2d 489, 492

7    n.4 (9th Cir. 1988); *Trident Seafoods Corp. v. Commonwealth Ins. Co.*, 850 F.Supp.2d 1189,

8    1204-05 (W.D. Wash. 2012); *Ainsworth v. Progressive Cas. Ins. Co.*, 180 Wash.App. 52, 76

9    (2014).  However, the Court finds that MetLife has not met its burden of establishing its

10   mitigation defense.  MetLife suggested that plaintiffs should have insisted that Heritage

11   undertake the effort and expense of bringing in fans and other drying equipment immediately

12   after the fire to minimize water damage to the first floor of the house, because such mitigation

13   efforts were contemplated by the Emergency Services contract Gary Taladay signed with

14   Heritage immediately after the fire.  However, several witnesses testified that the "damage was

15   done" and additional mitigation efforts would not have saved the first floor of the home from

16   needing to be gutted.  Even Mr. Berglund initially testified that he had "no criticism" of the

17   steps plaintiffs took to mitigate the loss following the fire.  Thus, Mr. Berglund's adjustment of

18   Mr. Gibbons' original estimate is also not justified by plaintiffs' alleged failure to adequately

19   mitigate the water damage.

20

21   _____

22        [30] It appears that the amount due on the loan was $96,662.00, which presumably
     includes additional late fees and foreclosure expenses. Ex. 99.  The March 15, 2015 payoff
23   quote for the mortgage from Dimont was $89,526.  There was no evidence introduced at trial
     regarding whether the Taladays received any surplus from the sale, although receipt was
24   acknowledged during closing arguments, and Chase bank had already been paid approximately
     $52,000 actual cash value for the home. Ex. 60.

MEMORANDUM OPINION - 29

1    Finally, the Court finds that not only did MetLife wrongfully deny coverage for repairs

2    to the first floor of the house, but this denial of coverage was never communicated to the

3    Taladays.  This conduct violated WAC 284-30-380(1-3), which provides that an "insurer must

4    not deny a claim on the grounds of a specific policy provision, condition, or exclusion unless

5    reference to the specific provision, condition, or exclusion is included in the denial," which

6    must be "given to the claimant in writing[.]"

7    G.    MetLife Failed to Render "Reasonable Assistance" to Gary Taladay in Obtaining
           Loss of Use Payments Owed Under the Policy

8    Gary Taladay was an insured who was displaced by the fire, and therefore MetLife was

9    obligated to pay, at his choice, fair rental value ("FRV") payments or reimbursement of his

10   additional living expenses ("ALE") under the policy. Ex. 21 at Met000845.  Mr. Berglund

11   testified at trial that ALE payments are typically greater than FRV, because ALE includes costs

12   like on-site laundry, parking, gas, food costs for dining out, as well as the cost of staying in a

13   hotel.  The insureds are required to save their receipts and produce them for reimbursement.

14   FRV is the cost of renting a similar sized home in the area.  Mr. Berglund acknowledged that

15   in this case, however, FRV of the Taladay home was higher than Gary Taladay's ALE, because

16   the Western Inn cost less than $1,000 per month.

17   Mr. Berglund testified that he most likely had a conversation with Gary Taladay about

18   the difference between ALE and FRV because it is his practice to discuss "the options" with

19   the insured.  Mr. Berglund believes this conversation took place when he first met with Gary at

20   the house because his claim notes reflect the price of Gary Taladay's hotel, but no other notes

21   regarding their conversation about loss of use benefits. *See* Ex. 97 at MET000022 (noting that

22   "Gary had been living in the hotel since the fire at a rate of $998 a month.")   However, Mr.

23   Berglund concedes that he did not actually calculate the FRV of the Taladay home until

24

1    months later, although he acknowledged that such information would have helped inform Gary

2    Taladay's choice between FRV and ALE.  Mr. Berglund testified that it is now his practice to

3    send out a letter giving the insured the option to elect ALE or FRV, although he did not send

4    out such a letter at the time of his meeting with Gary Taladay.

5         Finally, Mr. Berglund testified that he did not send Gary Taladay a written request for

6    receipts or ask plaintiffs' counsel to obtain hotel receipts, and he could not recall whether he

7    verbally told Gary Taladay that he would need to submit hotel receipts before MetLife could

8    reimburse him for ALE.  However, Mr. Berglund asserts that it was Gary Taladay's

9    responsibility, if he wanted his ALE to be reimbursed, to submit receipts to MetLife and ask to

10   be reimbursed for his living expenses.

11        At trial, plaintiffs testified that Mr. Berglund did not advise Gary Taladay of his right to

12   choose either ALE or FRV under the policy, or instruct him to submit his hotel receipts to

13   MetLife.  In addition, plaintiffs testified that Mr. Lindsay had already told them Gary Taladay

14   would not be entitled to reimbursement for ALE under the policy, and so Gary Taladay was

15   still unsure of whether he would be reimbursed for his living expenses.

16        MetLife only offered Mr. Taladay loss of use payments after this Court became

17   involved.  Specifically, on March 25, 2015, the Court granted plaintiffs' motion for partial

18   summary judgment confirming that the damage to the late Ms. Taladay's residence resulting

19   from the accidental fire was a covered cause of loss under her insurance policy.  Dkt. 28.  On

20   April 2, 2015, plaintiffs submitted two receipts from Gary Taladay's motel, the Western Inn,

21   for reimbursement by MetLife.  Ex. 58.[31]  Heritage also submitted invoices to MetLife on

22   March 3, 2015, requesting payment for emergency services rendered.  Dkt. 117 at 5.

23   _____

24        [31] Notably, the first Western Inn bill shows a printing date of July 10, 2014,
     approximately eight months before receipts were submitted to MetLife and within days of the

MEMORANDUM OPINION - 31

1    On May 18, 2015, MetLife sent letters stating that they were paying Heritage $6,047.40

2    and Gary Taladay $9,460 for four months of loss of use of the home (FRV). Ex. 173.[32]

3    However, when those payments were never received by plaintiffs, the Court ordered MetLife

4    to promptly re-issue the checks. Dkt. 44. Mr. Berglund testified that MetLife did not issue the

5    loss of use payments earlier than May 2015 because the onus is on the plaintiffs to send

6    MetLife the receipts for reimbursement, and those receipts were not provided by the Taladays.

7    Once he finally received the hotel receipts from Gary Taladay, Mr. Berglund obtained a FRV

8    computation of the Taladay home from a company called ALE Solutions, and paid that amount

9    because it was a greater sum than ALE would have been. Ex. 172 (ALE Solutions estimate

10    dated May 15, 2015); Ex. 176 (check for $9,460 dated Mary 18, 2015).

11    Plaintiffs then moved the Court to award an additional $24,161 for Gary Taladay's loss

12    of use of the home following the fire pursuant to the Loss of Use provision of the contract.

13    Dkt. 56. By Order dated October 16, 2015, the Court granted plaintiffs' motion, and noted that

14    MetLife failed to explain why it had only attempted to compensate Mr. Taladay for four

15    months of Loss of Use coverage when its own expert, Mr. Gibbons, estimated that it would

16    take a minimum of six months to repair the structure. Dkt. 66 at 6. Indeed, Mr. Gibbons

17    testified at trial that it would probably take more like eight or nine months. Accordingly,

18

19    initial complaint being filed in this case. Ex. 135. That invoice shows Gary Taladay's check

20    in date as September 16, 2013 and a check out date of July 19, 2014. Ex. 169. The second
     invoice, printed on March 24, 2015, shows a check in date of March 15, 2015 and a check out

21    date of April 14, 2015. Ex. 169. MetLife did not receive any receipts for the time period
     between these two invoices, or receipts for any of Gary Taladay's other living expenses.

22    [32] MetLife provides a copy of the May 18, 2015 check and envelope bearing the U.S.
     Post Office stamp "Return to Sender, Not Deliverable as Addressed," presumably to show that

23    payment was promptly issued by MetLife to the correct address (something defense counsel
     argued stridently during a status hearing on the issue). However, MetLife has inexplicably

24    redacted the mailing address on the envelope, rendering it impossible to determine how
     MetLife actually addressed the original check. Ex. 176.

MEMORANDUM OPINION - 32

1   pursuant to this Court's two Orders, MetLife paid plaintiffs the policy limit ($33,621) for loss

2   of use coverage under the policy in October 2015.  Dkt. 66.

3          The Court did not find Mr. Berglund's testimony, that he offered Gary Taladay a choice

4   between FRV and ALE, and explained the difference, to be credible.  As a result, MetLife

5   violated WAC 284-30-350(1) by "fail[ing] to fully disclose to first party claimants all pertinent

6   benefits, coverages or other provisions" of the policy.  Even if Mr. Berglund had offered Gary

7   Taladay a choice between FRV and ALE during their first meeting, such a choice was illusory

8   in light of the fact that Mr. Berglund had not yet obtained the estimated FRV for the home.

9   Mr. Taladay did not have the ability to calculate FRV himself, and so Mr. Berglund

10  undoubtedly did not provide sufficient information for Gary Taladay to make an informed

11  choice.  This is evidenced by the fact that, even after Gary explicitly requested ALE payments

12  and submitted hotel receipts, Mr. Berglund discovered that FRV was a substantially larger

13  sum.  The Court is also deeply troubled by the fact that Mr. Berglund conceded that he did not

14  advise Gary Taladay that he needed to submit receipts for any living expenses for

15  reimbursement.[33]  Gary Taladay has a very limited education, and clearly experiences chronic

16  pain from a medical condition.  It is difficult to imagine an insurance adjustor meeting with

17  him and discussing loss of use benefits, and somehow failing to explain what steps must be

18  taken to submit a claim to MetLife.  This does not constitute "reasonable assistance" under

19  WAC 284-30-360(4).[34]

20

21

---

22  [33] In light of Mr. Berglund's conduct throughout this case, the Court also finds Mr.
    Berglund's testimony that he paid FRV instead of ALE because "it allowed him to pay more
23  money" to be less than fully credible.
    [34] WAC 284-30-360(4) provides that an insurer must "promptly provide necessary
24  claim forms, instructions, and reasonable assistance so that first party claimants can comply
    with the policy conditions and the insurer's reasonable requirements."

MEMORANDUM OPINION - 33

1    MetLife is not solely responsible for the substantial delay in loss of use payments in

2    this case, however.  Gary Taladay's first Western Inn bill shows a printing date of July 10,

3    2014, approximately eight months before the receipts were submitted to MetLife and within

4    days of the initial complaint being filed in this case.  Ex. 135.  At the time when those receipts

5    were printed, plaintiffs were already represented by their counsel, who is experienced enough

6    to know that MetLife is not going to issue ALE payments without receipts.  Plaintiffs have not

7    provided any satisfactory explanation for the eight-month delay in furnishing those receipts to

8    MetLife.  Moreover, plaintiffs failed to produce an invoice for Gary Taladay's hotel stay

9    between July 19, 2014 and March 15, 2015, or any other receipts documenting his living

10   expenses since the fire.  As a result, MetLife's failure to actually issue any loss of use

11   payments prior to receiving the hotel receipts from Gary Taladay in April 2015 was not

12   unreasonable.

13        H.  MetLife Unreasonably Delayed Payment for Damaged Contents

14   The most contentious dispute between the parties, until only a few weeks before trial,

15   concerned plaintiffs' claim for reimbursement for their damaged personal property.  The

16   unpaid portion of the of $94,139 policy limit for personal property was paid by MetLife on

17   February 16, 2016.  Dkt. 117 at 6.  As a result, the parties' only remaining dispute regarding

18   the contents is whether MetLife's substantial delay in making that payment was reasonable.[35]

19

20   [35] MetLife introduced substantial evidence at trial that the billing practices of Heritage
     Restoration were unreliable, and Heritage may have billed MetLife for the same work on two
21   separate occasions or otherwise inflated their invoices for emergency services, cleaning
     salvageable items, and storing contents removed from the home.  Plaintiffs demonstrated that
22   MetLife was mistaken, in some respects.  For example, one of the allegedly duplicative
     invoices was actually an estimate that preceded the final bill, which is why it reflected the
23   same work.  In any event, the Court agrees with MetLife that Heritage's accounting practices
     are perplexing, to say the least.  However, Heritage is not a party to this action, and whether
24   Heritage's invoices are inflated is not material to the outcome of this action  between plaintiffs
     and MetLife.

MEMORANDUM OPINION - 34

1    The second day that Mr. Berglund visited the Taladay residence, he created an

2    inventory of approximately 140 items in the attic that he could tell were damaged by the fire.[36]

3    Mr. Berglund testified that one of the ways MetLife provides "reasonable assistance" to its

4    customers is by helping the insured provide an inventory list of damaged items, which may

5    involve the assigned MetLife adjustor partially generating such a list.  Mr. Berglund testified

6    that his *current* practice is to share his list of damaged items with his customers fairly promptly

7    to help them provide their required list of contents.  However, at the time Mr. Berglund was

8    assigned to the plaintiffs' claim, he was not sharing his inventory list with the insured.

9    Accordingly to Mr. Berglund, he withheld his partial inventory list from the plaintiffs because

10   plaintiffs had not yet generated their own complete inventory list of damaged items.

11   Mr. Berglund used his partial inventory list to create a June 11, 2014 estimate for the

12   cost of repairing the house and cleaning the contents.  Ex. 13.[37]  However, Mr. Berglund did

13   not share his estimate with plaintiffs until March 2015, although he could not explain why he

14   withheld that estimate for so long.  Mr. Berglund later prepared a second estimate on March

15   16, 2015, and also did not share that estimate with the plaintiffs.  Ex. 52.

16   Mr. Berglund testified that he wanted the Taladays to provide an estimate of the

17   damage to their personal property by submitting a completed Proof of Loss form.[38]  On July

18

---

19   [36] He used a headset and LifeScribe with a company called Enservio to dictate a list of
     damaged contents.  Enservio can price them and provide MetLife with a value for the items
20   within a couple of days.
     [37] Although Ex. 13 identifies Seth Alexander as the author, it was prepared by Mr.
21   Berglund.
     [38] As noted above, Mr. Berglund testified that the Proof of Loss form was not actually
22   needed to adjust the plaintiffs' claim for structure damage, loss of use payments, or cost of
     cleaning the salvageable contents, although he never clarified this with the Taladays.  For
23   example, the form does not request any information regarding the loss of use coverage being
     requested by the insured.  This fact is at odds with Mr. Berglund's prior representation in his
24   declaration submitted to the Court in support of MetLife's summary judgment motion asserting
     that Gary Taladay "declined" to elect ALE or Fair Rental Value when he returned the form.

MEMORANDUM OPINION - 35

1    11, 2014, Mr. Berglund sent Denny Taladay the Proof of Loss form, and asked him to return it

2    along with "all necessary documents in support of your claim" within sixty (60) days. Ex. 16.

3    He also asked Denny Taladay to identify what items belong to Rosemarie Taladay, Gary

4    Taladay, Bernard Taladay, and Bernard's girlfriend (another prior resident of the home). In

5    addition to a few specific questions such as the date of the loss, the Proof of Loss form asked

6    the Taladays to estimate the "actual cash value" of the property at the time of the loss, the

7    "whole loss and damage (including any applicable sales tax)", and the total "amount claimed"

8    under the policy. Ex. 16. For example, the form does not differentiate between personal

9    property loss and structure damage.

10         The testimony at trial, even from MetLife's representatives, established that MetLife's

11   Proof of Loss form is very poorly drafted and confusing. Mr. Berglund did not know how to

12   fill out the Proof of Loss form, particularly Schedules A-C on the second page. For example,

13   the Proof of Loss asks the insured to estimate "actual cash value" of the property at the time of

14   the loss, but Mr. Berglund testified that he would not expect a homeowner to actually be able

15   to calculate depreciation of their damaged property as that is part of his duties as adjuster.

16   Similarly, MetLife does not send out instructions regarding how to complete Schedules A-C on

17   the second page of the form, and Mr. Berglund did not know what should be written in those

18   Schedules. The Proof of Loss form also includes a "release and authorization of payment" at

19   the bottom, providing that "the repair or replacement of the loss and damage . . . has been made

20   to [the homeowner's] entire satisfaction," and therefore MetLife's payment "shall constitute a

21   full performance of the obligations of the insurer under its policy" and MetLife is released

22   from any future liability. Ex. 16. Mr. Berglund conceded that MetLife should not ask

23   homeowners to sign a release before they had received money and full repairs were completed.

24

1    Denny Taladay submitted a partially completed Proof of Loss form on September 3,

2   2014.  Ex. 27.  He filled out the entire form, including identifying who was living at the home

3   at the time of the fire, the date of the loss, and who the mortgage company was.  Ex. 27.

4   However, in the sections of the form requesting estimates of "Actual Cash Value" of the

5   property, "Whole Loss and Damage (including any applicable sales tax)", and "Amount

6   Claimed under the . . . policy", he only wrote "unknown."  Ex. 27.  In light of Mr. Berglund's

7   testimony that the form and accompanying instructions were so confusing that he did not

8   personally know how to complete it, the Court finds that it was unreasonable for MetLife to

9   use the fact that Denny Taladay wrote "unknown" on the form as an excuse not to adjust

10   plaintiffs' claim.  This is particularly true in light of Mr. Berglund's testimony that he does not

11   assist his customers in completing the form, or provide any additional instructions on how to

12   complete it, even if customers call him directly to request assistance.

13    As noted above, in late September 2014 plaintiffs' counsel asked if MetLife had made a

14   coverage decision and if there was anything else MetLife needed from the Taladays.  Ex. 29.

15   Mr. Berglund requested a "properly completed proof of loss, which includes a completed

16   inventory list."  Ex. 30.  Again, Mr. Berglund failed to advise plaintiffs at that time that his

17   initial coverage investigation had concluded, and therefore the unsalvageable personal property

18   damaged by the fire would be covered.  Plaintiffs' counsel responded that his clients would

19   need to hire a professional inventory company to list and appraise all the damaged items due to

20   the large volume, but were unable to afford such a company until they knew MetLife's

21   coverage decision.  Ex. 30.  On October 14, 2014, Mr. Berglund told plaintiffs' counsel that

22   "Our coverage determination will be based upon a full and complete investigation of the claim,

23   which includes our review of your client's inventory of damaged or destroyed items."  Ex. 32.

24   In early December 2014, plaintiffs' counsel again advised MetLife that plaintiffs needed to hire

MEMORANDUM OPINION - 37

1   a professional to assist with an inventory list, but could not afford to do so unless MetLife will

2   pay them for the damaged items.  Ex. 33.  When MetLife finally responded to plaintiffs' letter,

3   MetLife simply reiterated that "the continued adjustment of your client's claim is contingent

4   upon your client's willingness to present an inventory of lost or damaged items."  Ex. 35.

5        On May 18, 2015, MetLife issued its first partial payment of plaintiffs' contents claim

6   in the form of a $6,047 payment directly to Heritage for the packing, handling, and repairs of

7   the insured's contents.  Ex. 67.  On June 22, 2015, plaintiffs provided MetLife with the

8   Taladay Total Loss Report (which identifies the unsalvageable personal property items) and

9   the Taladay Presentation Report (which identifies cleanable items), but these reports failed to

10  include the price and age of the items.  Exs. 73-77.  On September 28, 2015, plaintiffs provided

11  MetLife with a complete inventory list generated by a different company, ICDR, Inc., which

12  included the estimated age and price of plaintiffs' unsalvageable items.  Ex. 85.[39]

13       After MetLife received several additional invoices from Heritage pertaining to

14  cleaning, storage, and disposal of plaintiffs' contents, MetLife offered to issue the remaining

15  payment on plaintiffs' contents claim on November 19, 2015.  Ex. 93.  On December 17, 2015,

16  plaintiffs elected to have personal property owned by prior guests of the home covered by the

17  policy, including Bernard and Denny Taladay.[40]  On February 16, 2016, MetLife issued a

18  check for the unpaid contents limits of $91,771, payable to The Estate of Rosemary Taladay,

19  Bernard Taladay, Gary Taladay, and Denny Taladay.[41]  Dkt. 95.

20

21        [39] On October 7, 2015, plaintiffs and MetLife learned that Heritage had unfortunately
    disposed of all remaining contents in the house.  Ex. 88.

22        [40] The Court authorized MetLife to issue the contents check payable to all the claimants
    jointly.

23        [41] This payment was based upon the stated policy limit of $94,139, increased to reflect
    inflation under the "Inflation Guard" coverage, less $5,047.40 paid to Heritage for cleaning

24  and storage.  Dkt. 117 at 6.

1    As MetLife has already issued the policy limits for lost contents, it is undisputed that no

2    additional funds are owed to plaintiffs for their fire-damaged personal property.  However, the

3    Court finds that MetLife's delay in issuing payment until only a few weeks before trial was

4    unreasonable.

5    Mr. Berglund's conduct with respect to the contents was unreasonable from the very

6    outset of this action, when he concealed his partial inventory of personal property items from

7    the plaintiffs – even after plaintiffs repeatedly advised him that they needed professional

8    assistance to inventory and appraise the items but could not afford it.  Plaintiffs' need for

9    professional assistance to inventory and appraise the approximately 2,000 fire-damaged items

10   is understandable, especially in light of Mr. Berglund's testimony that he personally wore a

11   respirator while he was creating his inventory list due to the conditions inside the home.  Mr.

12   Berglund's supervisor, Dan Reist, testified that MetLife typically prepares lists of damaged

13   items in the insured's homes and then shares a copy of that list with the homeowner for

14   supplementation.  This practice is part of the "reasonable assistance" MetLife provides to its

15   customers.

16   Thus, MetLife failed to provide the Taladays with the "reasonable assistance" required

17   by WAC 284-30-360(4)[42] when MetLife required plaintiffs to generate an inventory list (and

18   arbitrarily made the adjustment of plaintiffs' entire claim contingent upon the production of

19   such a list) while simultaneously withholding the Enservio list MetLife had already generated.

20   Similarly, MetLife failed to provide "reasonable assistance" by failing to help plaintiffs

21   complete the confusing Proof of Loss form, and unreasonably withholding Mr. Berglund's

22   June 2014 and March 2015 estimates.  Ex. 13, Ex. 52.  Mr. Reist also testified that such

23

24   [42] WAC 284-30-360(4) provides that "every insurer must promptly provide necessary claim forms, instructions, and reasonable assistance so that first party claimants can comply with the policy conditions and the insurer's reasonable requirements."

MEMORANDUM OPINION - 39

1    estimates are typically shared with the insured, and he had mistakenly believed Mr. Berglund

2    had shared them with plaintiffs in this case.

3         I.   Metlife's Conduct Violated IFCA, the CPA, and Breached the Duty of Good Faith

4              MetLife's conduct in this case amounted to an unreasonable denial of a claim for

5    coverage or payment of benefits to which plaintiffs were entitled under the policy.  Plaintiffs

6    have established that MetLife unreasonably denied plaintiffs' claim for coverage, and also

7    violated numerous insurance regulations, including several provisions of WAC 284-30-330

8    and WAC 284-30-360.[43]  RCW 48.30.015(1).  As mentioned above, although MetLife never

9    explicitly denied plaintiffs' requests for coverage, MetLife's unreasonable delay in payment

10   and/or underpayment of various aspects of plaintiffs' claim violated IFCA.  *See e.g., Morella*,

11   2013 WL 1562032, at *3; *Freeman*, 2012 WL 2891167, at *3.

12             MetLife's numerous violations of the WAC 284-30-330 and WAC 284-30-360 also

13   constitute violations of the CPA, because a single violation of any of the WAC insurance

14   regulations is an unfair or deceptive act or practice under the CPA.  As discussed above, in

15   Washington, to prove an insurer violated the CPA, the insured only has to show that the insurer

16   breached one or more of the WAC regulations and that the insured was injured by that

17   breach.[44]  Plaintiffs have made such a showing in this case.

18

19        [43] IFCA provides a list of violations that give rise to treble damages or to an award of
20   attorney's fees and costs, and this list includes violations of WAC 284–30–330, 350, 360, 370,
     and 380.  RCW 48.30.015(5).

21        [44] Specifically, to prevail on a CPA claim a plaintiffs must show that the insurer's
22   conduct met the elements of the *Hangman Ridge* five-part test: (1) an unfair or deceptive act or
     practice, (2) occurring in trade or commerce, (3) impacting the public interest, (4) injuring
23   plaintiff in his business or property, and (5) causation. *Hangman Ridge v. Safeco Title*, 105
     Wash.2d 778, 780, 719 P.2d 531 (1986).  The first element is met by any violation of WAC
24   284-30-330 through 800.  *See Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wash. App. 686, 697, 17
     P.3d 1229 (2001).  The second and third elements are automatically met in the context of
     insurance because it is a business which affects the public interest. *See* RCW 48.01.030.

MEMORANDUM OPINION - 40

1     Finally, as a matter of law, a violation of any one of the regulations set forth in WAC

2    284-30-300 through 800 constitutes a breach of the insurer's duty of good faith. *See Am. Mfrs.*

3    *Mut. Ins. Co. v. Osborn*, 104 Wash. App. 686, 697-98, 17 P.3d 1229 (2001).  Thus, each of

4    MetLife's violations of the WAC regulations discussed above also breached its duty of good

5    faith to plaintiffs.

6                                        IV.     DAMAGES

7         Under IFCA, a court "may, after finding that an insurer has acted unreasonably in

8    denying a claim for coverage or payment of benefits or has violated [certain insurance

9    regulations], increase the total award of damages to an amount not to exceed three times the

10   actual damages."  RCW 48.30.015(2).  The decision to award treble damages is discretionary.

11   *F.C. Bloxom Co. v. Fireman's Fund Ins. Co.*, No. C10-1603RAJ, 2012 WL 5992286, at *6

12   (W.D. Wash. Nov. 30, 2012) ("the legislature left it to the discretion of superior court judges to

13   decide how much to enhance damages").  *Accord Schreib v. American Family Mut. Ins. Co.*,

14   129 F. Supp. 3d 1129, 1142 n.12 (W.D. Wash. 2015) ("IFCA's discretionary treble damages").

15        "Actual damages" are not defined in IFCA, but are generally understood as the amount

16   necessary to compensate plaintiff for an injury or loss.  *Morella v. Safeco Ins. Co. of Illinois*,

17   No. C12-0672RSL, 2013 WL 1562032, at *4 (W.D. Wash. Apr. 12, 2013) (citing *Blaney v.*

18   *Int'l Ass'n of Machinists and Aerospace Workers, Dist. No. 160*, 114 Wash. App. 80, 96

19   (2002)).  The term "actual damages" within the meaning of IFCA excludes emotional distress

20   damages.  *Schreib*, 129 F. Supp. 3d at 1141 ("Because IFCA's language is ambiguous as to

21   emotional damages and it sounds in negligence, the court concludes it excludes the availability

22   of emotional damages as 'actual damages.'").[45]

23   _____

24        [45] The CPA is comparable.  "Emotional damages, such a pain and suffering, and their
     attendant physical manifestations are not compensable and do not constitute injury under the

     MEMORANDUM OPINION - 41

Emotional damages are recoverable for an insurer' bad faith. *Anderson v. State Farm Mut. Ins. Co.*, 101 Wash. App. 323, 333 (2000). *Accord Werlinger v. Clarendon Nat. Ins. Co.*, 129 Wash. App. 804, 809 (2005) ("Because bad faith is a tort, a plaintiff may seek emotional damages."). Plaintiffs must present evidence that they suffered emotional distress as a result of the insurer's bad faith actions, not merely evidence that they were distressed by the underlying accident or event in the insurance claim. *Werlinger,* 129 Wash. App. at 809. The evidentiary standard for bad faith emotional distress is different from the evidentiary standard for negligent infliction of emotional distress, which requires the emotional response to be corroborated by objective symptomatology. *See Scanlon v. Life Ins. Co. of North America*, 670 F. Supp. 2d 1181, 1196-97 (W.D. Wash. 2009); *accord Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1250 (9th Cir. 1998). In *Scanlon*, the Court held that the plaintiff's allegations were sufficient to create a jury question as to whether she suffered emotional distress because "a party can rely exclusively on his or her own testimony to establish emotional distress in a bad-faith insurance case." *Scanlon*, 670 F.Supp.2d at 1197 (citing *Woo v. Fireman's Fund Ins. Co.*, 161 Wash. 2d 43, 70 (2007) (affirming an award of emotional distress damages for breach of the duty of good faith despite the fact that there was no medical or expert testimony concerning the emotional distress)). The Ninth Circuit explained that the basic assumption underlying traditional evidentiary standards for emotional distress – "that emotional distress without physical injury is relatively trivial and easily feigned" – does not apply in bad faith insurance cases because "when an insurance company wrongly refuses to honor its obligations, emotional distress is a natural and believable response. Insureds bargained and paid for the security and peace of mind of knowing that reimbursement and financial support will be

---

CPA." *Dees v. Allstate Ins. Co., 933* F. Supp. 2d 1299, 1310 (W.D. Wash. 2013) (citing *Wash. St. Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wash. 2d 299, 318 (1993)).

1    provided in the event that a misfortune occurs." *Ace*, 139 F.3d at 1250.  In *Anderson*, a ten-

2    month delay caused by an insurance company's bad faith failure to disclose a pertinent

3    coverage entitled a plaintiff "to a trial to prove the amount of damages, both financial and

4    emotional," caused by the insurer's conduct. *Anderson*, 101 Wash. App. at 333.  Thus, under

5    Washington law, plaintiffs may seek general damages for their emotional distress caused by

6    MetLife's bad faith without introducing expert testimony showing objective symptomatology

7    of that emotional distress.

8            The total damage figure may be compiled by calculating the damages amounts for

9    violations of the IFCA, the CPA, and the duty of good faith.  *See Hazzard v. Union Bankers*

10   *Ins. Co.*, No. C13-1162RSL, 2014 WL 773533 at *1 n. 4 (W.D. Wash. Feb. 25, 2014)

11   (calculating the amount-in-controversy figure by compiling damage calculations under the

12   IFCA, the CPA, and attorney's fees); *see also Burke Family Living Trust v. Metropolitan Life*

13   *Ins. Co.*, No. C09-5388 FDB, 2009 WL 2947196 at *3 (W.D. Wash. Sept. 11, 2009)

14   ("Plaintiff's claims for treble damages amount to $160,000 ($50,000 in contract damages x 3

15   pursuant to IFCA + [the former] $10,000 CPA ceiling on treble damage)").

16           Here, plaintiffs are seeking payment for the remaining amounts owed under the

17   insurance contract, plus a trebling of the entire value of the claim pursuant to IFCA.  The

18   parties agree that MetLife does not owe any money for personal property loss or loss of use

19   coverage, with the exception of an undisclosed amount pursuant to the Inflation Protection

20   Coverage provision of the contract for Gary Taladay's Loss of Use coverage.  Ex. 96.[46]

21   However, plaintiffs contend that MetLife still owes them $77,585 for the unpaid cost of repairs

22   to the home.  In addition, plaintiffs seek reimbursement of vendor fees in the total amount of

23

24          [46] MetLife's February 19, 2016 payment for personal property coverage was already
     increased to account for the Inflation Protection coverage.

MEMORANDUM OPINION - 43

$27,918.[47] With respect to punitive damages, plaintiffs ask the Court to treble the entire value of the claim under IFCA ($130,086 for structure damage, $97,818 for personal property damage, $33,621 for loss of use, plus $27,918 for the vendor's fees), award up to $75,000 under the CPA ($25,000 CPA ceiling x 3 plaintiffs), and award a total of $104,440 general damages caused by the tort of insurance bad faith ($70 each per day for 746 days for Gary and Denny Taladay), for a total of $1,047,769.

As discussed above, plaintiffs are not without any fault in this case and could have taken certain steps to improve the adjustment of their claim, such as promptly submitting hotel receipts to MetLife for reimbursement. The Court has taken MetLife's arguments into consideration in calculating damages, and does not find it appropriate to award the full amount of damages sought by plaintiffs.

In light of the fact that MetLife has already paid the policy limits for loss of use and personal property damage, the Court finds that the remaining "actual damages" under IFCA are $77,585 for MetLife's erroneous adjustment of plaintiffs' structure claim under the contract. Plaintiffs' original contractor, Mr. Anderton, was willing and able to undertake repairs on the home if MetLife had not wrongfully denied coverage for "gutting" the first floor of the home. Although ordinarily MetLife would not be contractually required to pay the full cost of repairs until after such repairs are undertaken, in this case the house was foreclosed upon in February 2016 as a direct result of MetLife's unreasonable denial of coverage. By authorizing far less than the required scope of repairs, MetLife rendered plaintiffs unable to obtain full payment

---

[47] Specifically, plaintiffs have been charged $22,016 by Heritage for storing, photographing, listing, and disposing of more than 2,000 damaged items, and ICDR, Inc. has charged plaintiffs $5,902 for the cost of valuing and depreciating the damaged items. Ex. 86. Plaintiffs allege that the Heritage fees would have been much less, but for MetLife's delay in processing their claim, and the ICDR, Inc. fee would not have been necessary if MetLife had offered Enservio's services to plaintiffs.

MEMORANDUM OPINION - 44

1    under the contract.  Mr. Anderton's $130,086 estimated cost of repairs, minus MetLife's

2    $52,501 payment to Chase Bank for the structure, equals $77,585.[48]  The Court finds it more

3    appropriate to use Mr. Anderton's $130,086 estimate, rather than Mr. Gibbons' original

4    $122,528 estimate, because Mr. Gibbons' estimate did not include an additional $2,500 for

5    building permits (which would bring his estimate to $125,028) plus a potential additional cost

6    of $5,000-$10,000 for hazardous material remediation ($130,028 – $135,028).  Mr. Gibbons'

7    estimate also included $5,000 non-covered code upgrades, but did not include $5,000 for

8    engineering fees.  Thus, even Mr. Gibbons' estimate, when understood in context, exceeds

9    $130,000.

10        MetLife is not liable for plaintiffs' vendor's fees, and therefore the Court denies

11   plaintiffs' claim for an additional $27,918 to pay invoices from Heritage and ICDR, Inc.  These

12   fees would have been part of the personal property policy limits.  In addition, although the

13   Court has discretion to treble plaintiffs' actual damages award, in light of the issues presented,

14   the Court has doubled plaintiffs' structure damages for a total award under IFCA of $155,170

15   (less credit for the surplus funds).

16        The Court also awards plaintiffs jointly the statutory maximum of $25,000 under the

17   CPA, and Gary and Denny Taladay each $37,300 general damages for the tort of insurance bad

18   faith for their emotional distress ($50 each per day x 746 days = $37,300 x 2 = $74,600 total).

19   MetLife's unreasonable conduct in this case created undue stress and substantial hardship for

20   two vulnerable plaintiffs.  Abusive insurance practices take a severe toll on claimants, and in

21

22       [48] MetLife will be entitled to a credit for the surplus payment received by the Taladays
from the foreclosure sale.  A copy of the check will be provided to MetLife to see if agreement
23   can be reached on the amount of the credit within ten (10) days of the date of judgment.  If the
parties are unable to reach an agreement, the credit will be the subject of a post-judgment
24   modification to be decided by the Court with attorney's fees, and an amended judgment will be
entered.

MEMORANDUM OPINION - 45

1  this case MetLife's conduct caused the Taladays to permanently lose the family home they

2  grew up in.  Plaintiffs' testimony that MetLife's conduct had severe consequences for

3  plaintiffs' emotional well-being was credible, and the Court agrees that plaintiffs are entitled to

4  compensation for their emotional harm.  Plaintiffs will also be awarded attorney's fees and

5  costs in an amount to be determined by post-judgment submission to be filed not later than

6  thirty (30) days of this Order.

### V.    CONCLUSION

Accordingly, the Court finds that MetLife unreasonably denied coverage under the

contract, violated IFCA, the CPA, and breached the duty of good faith.  MetLife's conduct in

this case required plaintiffs to seek adjustment of their claim through motions practice and

Court order, which is not contemplated by the insurance regulations.  The Court ORDERS

MetLife to pay plaintiffs a total of $254,770 (less credit for any surplus payments from the

foreclosure sale), plus attorney's fees, and any additional sum due under the Inflation

Protection Coverage provision of the contract.  The $254,770 award is comprised of actual and

punitive damages under IFCA in the amount of $155,170, $25,000 under the CPA, and

$37,300 each for Gary and Denny Taladay (for a total of $74,600) as general damages for

MetLife's bad faith.

The Clerk is directed to send a copy of this Order to counsel for both parties.

DATED this **6ᵗʰ** day of July, 2016.


JAMES P. DONOHUE
United States Magistrate Judge

MEMORANDUM OPINION - 46